[No. 42283-2-II.    Division Two.    December 26, 2012.]

MELINDA MARCUM, *Appellant*, v. THE DEPARTMENT OF SOCIAL AND HEALTH SERVICES, *Respondent*.

*Alberto D. Casas* (of *Northwest Justice Project*), for appellant.

*Robert M. McKenna, Attorney General*, and *Lucretia F. Greer, Assistant*, for respondent.

¶1 QUINN-BRINTNALL, J. — On December 10, 2008, Melinda Marcum, the owner-operator of a Tacoma day-care center, accidentally left a two-year old child locked unattended inside her facility for 10 to 20 minutes. A complaint was filed and, following a brief investigation, the Department of Social and Health Services (DSHS) concluded that Marcum's oversight constituted negligent treatment of a child. Marcum unsuccessfully appealed this decision to DSHS for internal review, an administrative law judge (ALJ), DSHS's Board of Appeals (Board), and Thurston County Superior Court.

¶2 Marcum now timely appeals to this court, arguing that (1) DSHS's interpretation of WAC 388-15-009(5) is arbitrary and capricious or falls outside the agency's statutory authority as applied in her case and (2) the Board's final order affirming the neglect finding falls outside DSHS's authority or jurisdiction in violation of the Administrative Procedure Act (APA), ch. 34.05 RCW. Because the Board erred in failing to determine whether Marcum's actions showed "a serious disregard of consequences of such magnitude" that her actions created a "clear and present danger to [the unattended] child's health, welfare, or safety," as required by the definition of "negligent treatment" in RCW 26.44.020(14), we vacate the negligence finding and remand to the Board for further proceedings.

## FACTS

BACKGROUND

¶3 Marcum owned and operated Prime Time Childcare LLC, a Tacoma day-care center. From 5:30 AM to approximately 1:00 PM on December 10, 2008, she was the only person working at the day care. Despite having procedures in place intended to ensure constant supervision of the children in her care—such as using the "buddy system" and conducting frequent head counts—Marcum accidentally left a two-year-old child locked in the day-care facility for approximately 10 minutes that afternoon while she drove a few blocks away to pick up more children from a nearby Head Start program.

¶4 While Marcum and the other children were gone, a former employee, Tiffany Forrester, and Forrester's friend, Summer Rhodes, stopped at Prime Time so that Forrester could pick up a paycheck. As Forrester approached the building, she noticed two-year-old "John"[1] sitting just inside the locked door, wearing his winter coat. Forrester looked through the door's full-length glass window and did not see anyone else inside. She returned to her car, retrieved her set of keys to the day care, and told Rhodes that the child appeared to be locked inside alone. Forrester unlocked the door and, once inside, discovered that nobody else was present and that a plate of food had been left on a low table about 20 feet from where John was waiting. About two minutes later, Marcum returned in the van with the other children.

¶5 Forrester explained that because she had not been to Prime Time in a few months, the scene was chaotic when the children got out of the van: they ran to greet her and

---

[1] We have used an alias to protect the child's privacy. General Order 2011-1 of Division II, *In re the Use of Initials as Pseudonyms for Child Witnesses In Sex Crime Cases* (Wash. Ct. App.), *available at* http://www.courts.wa.gov/appellate_trial_courts/.

wanted to show her the Christmas tree they had decorated that morning. In the resulting excitement, Forrester forgot to tell Marcum that she had discovered John alone inside the building and Marcum did not realize that she had left him unsupervised until Child Protective Services (CPS) contacted her the next day.[2] Marcum did not believe the allegations at first but after speaking with Forrester, she accepted that she must have left John unsupervised for at least five minutes.

¶6 On December 31, CPS notified Marcum that it had made a founded finding of neglect. In light of this finding, the Department of Early Learning concluded that Marcum was disqualified as a child-care worker and revoked Prime Time's child-care license.[3] After administrative review, DSHS upheld the finding of neglect on February 17, 2009.

PROCEDURE

¶7 Marcum requested an administrative hearing on the neglect finding. On September 4, 2009, an ALJ issued an initial order upholding the DSHS neglect finding. Following this, Marcum filed a petition for review with the Board. On February 3, 2010, the Board issued its "Review Decision and Final Order." After stating that "Marcum testified credibly, and was backed up by parents, that she has had numerous protocols and procedures in place to ensure that children are safe and secure at her facility" and that "[t]here is absolutely no evidence whatsoever that Ms. Marcum would ever mistreat or harm a child intentionally," the Board affirmed the ALJ's initial order. Clerk's Papers (CP) at 23. The Board concluded that "[w]hen [Marcum] failed to provide adequate supervision necessary for [John's] health, welfare, or safety, [she] engaged in an act that is per se negligent treatment or maltreatment of a child." CP at 30.

---

[2] Rhodes called in the CPS complaint.

[3] Marcum challenged her license revocation at all stages of the proceedings below but does not raise that issue in this appeal.

¶8 Marcum petitioned Thurston County Superior Court for judicial review of the Board's final order. The superior court affirmed the Board's final order on May 23, 2011. Marcum now timely appeals the neglect finding to this court.

## DISCUSSION

### Is WAC 388-15-009(5) an Interpretive Rule?

¶9 As a preliminary matter, we must decide whether WAC 388-15-009(5) is an interpretive rule or a legislative rule, as this determination affects our standard of review. DSHS argues that WAC 388-15-009(5) is an interpretive rule and, accordingly, this court's review "is not into the validity of the rule but its 'correctness or propriety' — i.e., whether it conflicts with the legislative intent underlying the statute it interprets." Br. of Resp't at 11 (quoting *Ass'n of Wash. Bus. v. Dep't of Revenue*, 155 Wn.2d 430, 446, 120 P.3d 46 (2005)). Marcum argues that the rule is legislative, *at least as applied in her case*, and, accordingly, our review should be de novo. Marcum is correct. We need not decide whether, on its face, WAC 388-15-009(5) is a legislative or interpretive rule. As applied to Marcum, the Board clearly treated the rule as a legislative rule.

¶10 The APA defines the terms "interpretive rule" and "significant legislative rule":

> (ii) An "interpretive rule" is a rule, the violation of which does not subject a person to a penalty or sanction, that sets forth the agency's interpretation of statutory provisions it administers.
>
> (iii) A "significant legislative rule" is a rule other than a procedural or interpretive rule that (A) adopts substantive provisions of law pursuant to delegated legislative authority, the violation of which subjects a violator of such rule to a penalty or sanction; (B) establishes, alters, or revokes any qualification or standard for the issuance, suspension, or

revocation of a license or permit; or (C) adopts a new, or makes significant amendments to, a policy or regulatory program.

RCW 34.05.328(5)(c).

¶11 As the Washington Supreme Court has explained,

> Legislative rules must be consistent with the statutes [the administrative agency] is charged with administering and have the "same force and effect" as the statutes themselves. Such rules clearly cannot be merely interpretive, which by definition means nonbinding in the sense that violating the rule does *not* result in sanctions.

*Ass'n of Wash. Bus.*, 155 Wn.2d at 438-39.

> Technically, interpretive rules are not binding on the public. They serve merely as advance notice of the agency's position should a dispute arise and the matter result in litigation. The public cannot be penalized or sanctioned for breaking them. They are not binding on the courts and are afforded no deference other than the power of persuasion. Accuracy and logic are the only clout interpretive rules wield. If the public violates an interpretive rule that accurately reflects the underlying statute, the public may be sanctioned and punished, not by authority of the rule, *but by authority of the statute.*

*Ass'n of Wash. Bus.*, 155 Wn.2d at 447.

¶12 Here, the Washington Legislature has defined "negligent treatment" of a child as

> an act or a failure to act, or the cumulative effects of a pattern of conduct, behavior, or inaction, that *evidences a serious disregard of consequences of such magnitude as to constitute a clear and present danger to a child's health, welfare, or safety.* . . . When considering whether a clear and present danger exists, evidence of a parent's substance abuse as a contributing factor to negligent treatment or maltreatment shall be given great weight. The fact that siblings share a bedroom is not, in and of itself, negligent treatment or maltreatment. Poverty, homelessness, or exposure to domestic violence . . . that is perpetrated against someone other than the

child does not constitute negligent treatment or maltreatment in and of itself.

RCW 26.44.020(14) (emphasis added).

¶13 Although some overlap exists, DSHS's rule provides greater specificity:

> (5) Negligent treatment or maltreatment means an act or a failure to act, or the cumulative effects of a pattern of conduct, behavior, or inaction, on the part of a child's parent, legal custodian, guardian, or caregiver that shows a serious disregard of the consequences to the child of such magnitude that it creates a clear and present danger to the child's health, welfare, or safety. A child does not have to suffer actual damage or physical or emotional harm to be in circumstances which create a clear and present danger to the child's health, welfare, or safety. Negligent treatment or maltreatment includes, but is not limited, to:
>
> (a) Failure to provide adequate food, shelter, clothing, supervision, or health care necessary for a child's health, welfare, or safety. Poverty and/or homelessness do not constitute negligent treatment or maltreatment in and of themselves;
>
> (b) Actions, failures to act, or omissions that result in injury to or which create a substantial risk of injury to the physical, emotional, and/or cognitive development of a child; or
>
> (c) The cumulative effects of a pattern of conduct, behavior or inaction by a parent or guardian in providing for the physical, emotional and developmental needs of a child's, or the effects of chronic failure on the part of a parent or guardian to perform basic parental functions, obligations, and duties, when the result is to cause injury or create a substantial risk of injury to the physical, emotional, and/or cognitive development of a child.

WAC 388-15-009(5).

¶14 Whether DSHS treated WAC 388-15-009 as an interpretive or legislative rule, as applied to Marcum's case, turns on whether Marcum's violation of the rule resulted in sanctions, without regard for the legislature's definition of "negligent treatment" in RCW 26.44.020(14). Here, the Board

clearly treated WAC 388-15-009 as a legislative rule with the same force and effect as law and upheld a negligence finding against Marcum in light of her violation of section 5(a) of the WAC.

¶15 In the "Conclusions of Law" section of its final order, the Board ruled,

> The first sentence of WAC 388-15-009(5) creates the requirement that for a child's caregiver's act to be negligent, that act must "[show] a serious disregard of the consequences to the child of such magnitude that it creates a clear and present danger to the child's health, welfare, or safety." [WAC 388-15--009(5)(a)] lists those acts by a caregiver that are per se serious enough to meet the requirement of "[showing] a serious disregard ... of the consequences to the child of such magnitude that it creates a clear and present danger to the child's health, welfare, or safety." In subsection (a), the "failure to provide adequate . . . supervision . . . necessary for a child's health, welfare, and safety" is included in the list of sufficiently serious and therefore negligent acts. Thus, the proper factual and legal analysis is whether [Marcum's] actions failed to provide [John] with adequate supervision necessary for [John's] health, welfare, and safety; it is not whether [Marcum's] actions created a clear and present danger to [John].

CP at 29.

¶16 This ruling demonstrates the Board's view that Marcum's violation of WAC 388-15-009(5)(a) was a per se violation of the law without regard for the legislature's definition that "negligent treatment" involves "an act or a failure to act, or the cumulative effects of a pattern of conduct, behavior, or inaction, that evidences a serious disregard of consequences of such magnitude as to constitute a clear and present danger to a child's health, welfare, or safety." RCW 26.44.020(14). Here, the Board's ruling proclaimed that the standard provided by the legislature, "whether [Marcum's] actions created a clear and present danger to [John]," *is not* the standard that should be employed when determining whether neglect has occurred.

CP at 29. Accordingly, we conclude that as applied to Marcum's case, DSHS's interpretation of WAC 388-15--009(5) involves the adoption of "substantive provisions of law . . . the violation of which subjects a violator of such rule to a penalty or sanction," RCW 34.05.328(5)(c)(iii)(A), and therefore must be treated as a legislative rule.

DSHS's INTERPRETATION OF WAC 388-15-009(5)

¶17 Marcum argues that DSHS's as-applied interpretation of WAC 388-15-009(5) violates the APA because it is arbitrary and capricious and because it exceeds the agency's statutory authority. Although the rule is not arbitrary and capricious, we agree with Marcum that the agency's interpretation of the rule as applied to Marcum's case exceeded DSHS's statutory authority.

A. STANDARD OF REVIEW

¶18 We examine the validity of an agency's legislative rules de novo. *Ass'n of Wash. Bus.*, 155 Wn.2d at 446. The party challenging an agency rule has the burden of demonstrating its invalidity. RCW 34.05.570(1)(a); *Ass'n of Wash. Bus.*, 155 Wn.2d at 437. We may declare an agency rule invalid as applied if it " '(1) violates constitutional provisions, (2) exceeds statutory authority of the agency, (3) was adopted without compliance to statutory rule-making procedures, or (4) is arbitrary and capricious.' " *Ass'n of Wash. Bus.*, 155 Wn.2d at 437 (quoting *Wash. Pub. Ports Ass'n v. Dep't of Revenue*, 148 Wn.2d 637, 645, 62 P.3d 462 (2003)).

B. ARBITRARY AND CAPRICIOUS

¶19 To determine whether the Board's as-applied interpretation of WAC 388-15-009(5) was arbitrary and capricious, we must decide whether the interpretation involves a "willful and unreasoning action, without consideration and in disregard of facts and circumstances. Where there is room for two opinions, action is not arbitrary and

capricious even though one may believe an erroneous conclusion has been reached." *State v. Rowe*, 93 Wn.2d 277, 284, 609 P.2d 1348 (1980) (citations omitted).

¶20 Here, the CPS investigator assigned to the case testified at the administrative hearing that despite believing Marcum's actions were unintentional and did not evince a pattern of leaving children unattended, the neglect finding was warranted because of the inherent danger of leaving a child unsupervised, especially when food is left within reach. Also at the hearing, DSHS Division of Licensed Resources Facility Investigation Supervisor Linda Tosti-Lane acknowledged that the decision to enter a founded neglect finding in Marcum's case was "consistent with findings in similar cases" in the region she supervises. Administrative Report of Proceedings (July 13, 2009) at 119. And in its final order upholding the finding, the Board concluded that

> [Marcum] left [John] unattended and locked in the Primetime child care facility while she drove to an elementary school to pick up Head Start children. Although [John] was not hurt as a result of this oversight, a number of consequences could reasonably have happened, including without limitation, a fire, a natural disaster such as an earthquake, choking on food that was left out or on a toy or other object, a fall due to climbing, and an intrusion by an unknown and perhaps criminal person. Further, a traffic accident, natural disaster, or other unanticipated event could have delayed [Marcum] beyond the approximate ten minutes she was away. It is specifically found that [Marcum] failed to provide adequate supervision necessary for [John's] health, welfare, or safety on December 10, 2008.

CP at 28 (footnote omitted).

¶21 The Board clearly considered the facts and circumstances surrounding Marcum's case in interpreting WAC 388-15-009(5) and upholding the finding of neglect. And as evidenced by Tosti-Lane's testimony at the administrative hearing, such a finding is consistent with similar DSHS findings in the region. For these reasons, we conclude that

DSHS's interpretation of WAC 388-15-009(5) is not arbitrary and capricious because the Board's interpretation is neither "willful and unreasoning" nor "without consideration and in disregard of facts and circumstances."[4] *Rowe*, 93 Wn.2d at 284.

## C. BEYOND THE SCOPE OF DSHS'S AUTHORITY

■ ¶22 Although DSHS's interpretation of WAC 388-15-009(5) is not arbitrary and capricious, DSHS's as-applied interpretation of the rule clearly falls outside of DSHS's authority. An agency "does not have the power to promulgate rules which amend or change legislative enactments, the agency may adopt rules which 'fill in the gaps' if those rules are necessary" for implementing "a general statutory scheme." *State ex rel. Evergreen Freedom Found. v. Wash. Educ. Ass'n*, 140 Wn.2d 615, 634, 999 P.2d 602 (2000). But rules that extend a statute's punitive reach are an invalid exercise of agency power. *See, e.g., State v. Miles*, 5 Wn.2d 322, 326, 105 P.2d 51 (1940).

■ ¶23 Here, RCW 26.44.020(14) unambiguously provides the statutory standard the legislature intended DSHS to use in making a finding of neglect: negligent treatment of a child involves "an act or a failure to act, or the cumulative effects of a pattern of conduct, behavior, or inaction, that *evidences a serious disregard of consequences of such magnitude as to constitute a clear and present danger to a child's health, welfare, or safety*." (Emphasis added.) DSHS's interpretation of WAC 388-15-009(5), as applied to Marcum in the Board's final order, disregarded this standard and, in its place, concluded that *any* violation of WAC 388-15-009(5)(a) amounted to a per se violation of the WAC and RCW 26.44.020(14). Under this interpretation, the Board upheld a neglect finding—whether founded or not—without deter-

---

[4] Even the Board's interpretation that a violation of WAC 388-15-009(5)(a) is per se neglectful is not arbitrary or capricious, as reasonable minds could disagree about whether a single instance of failing to provide a child with "adequate food, shelter, clothing, supervision, or health care" constitutes negligent treatment.

mining if the action at issue created a clear and present danger to a child's health, welfare, or safety. But DSHS lacks authority to promulgate and interpret a rule that fundamentally shifts the standard required to make a neglect finding. Unless the legislature decides otherwise, DSHS must find that a caregiver's actions have "evidence[d] a serious disregard of consequences of such magnitude as to constitute a clear and present danger to a child's health, welfare, or safety," RCW 26.44.020(14), before entering or affirming a founded neglect finding.

THE BOARD'S FINAL ORDER

¶24 Last, Marcum argues that because the Board's final order relied on an invalid interpretation of WAC 388-15--009(5), it should be vacated. We agree. Although we would have deferred to the Board if it had found that Marcum's actions created a clear and present danger to John, we cannot, as a matter of law, conclude that DSHS has the legislative authority to implement a strict liability regime for the negligent treatment of children.

A. STANDARD OF REVIEW

¶25 In reviewing a superior court's final order on review of an administrative board's decision, we apply "the standards of the [APA] directly to the record before the agency, sitting in the same position as the superior court." *Honesty in Envtl. Analysis & Legislation (HEAL) v. Cent. Puget Sound Growth Mgmt. Hearings Bd.*, 96 Wn. App. 522, 526, 979 P.2d 864 (1999). We review only the board's decision, not the ALJ's decision or the superior court's ruling. *Verizon Nw., Inc. v. Emp't Sec. Dep't*, 164 Wn.2d 909, 915, 194 P.3d 255 (2008). We review de novo the board's legal determinations using the APA's "error of law" standard, and we may substitute our view of the law for the board's. *Verizon Nw.*, 164 Wn.2d at 915; *see* RCW 34.05-.570(3)(d). We give substantial weight to an agency's interpretation of the law within its expertise, such as regulations

the agency administers. *Silverstreak, Inc. v. Dep't of Labor & Indus.*, 159 Wn.2d 868, 885, 154 P.3d 891 (2007). Last, we will uphold an agency's factual findings if, when viewed in light of the record before the court, substantial evidence supports them. *William Dickson Co. v. Puget Sound Air Pollution Control Agency*, 81 Wn. App. 403, 411, 914 P.2d 750 (1996).

### B. The Board's Interpretation of WAC 388-15-009(5)

¶26 As explained in detail above, the Board's imposition of a strict liability regime in relation to the negligent treatment of children exceeded its statutory authority. Had the Board concluded that Marcum's actions "evidence[d] a serious disregard of consequences of such magnitude as to constitute a clear and present danger to a child's health, welfare, or safety," RCW 26.44.020(14), we would give substantial weight to such an interpretation in light of DSHS's expertise in this field. But unless a valid neglect finding has been entered under the appropriate statutory standard, we are not in the position to affirm such a finding. An appellate court does not make findings. Because the Board failed to make a determination of whether Marcum's actions violated RCW 26.44.020(14)'s "clear and present danger" standard and, instead, created its own, more stringent standard, without legislative authority, we must vacate the Board's final order and remand for further proceedings. RCW 34.05.574(1)(b).

### Attorney Fees

¶27 Marcum argues that she is entitled to recover her attorney fees pursuant to Washington's "equal access to justice act" (EAJA), RCW 4.84.340-.360. To prevail under the EAJA, a party needs to show that the agency involved was not substantially justified in its actions. Marcum has not met that burden here.

¶28 DSHS (and the Board) had a reasonable basis in both law and fact to believe that Marcum neglected John in

violation of RCW 26.44.020(14). Moreover, a reasonable person could conclude that *any* violation of WAC 388-15--009(5)(a) would constitute negligent treatment (though DSHS lacks legislative authority to implement this commonsense reasoning as a standard to be applied with the force of law). *Silverstreak*, 159 Wn.2d at 885. Thus, although DSHS exceeded its statutory authority in adopting a per se rule for founded neglect when a caregiver violates WAC 388-15-009(5)(a), it had a reasonable basis—the protection of Washington's children—for doing so. Its actions were not substantially unjustified, and we decline to award Marcum attorney fees.

¶29 Accordingly, we vacate the negligence finding and remand to the Board for further proceedings.

JOHANSON, A.C.J., and PENOYAR, J., concur.