# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| FYODOR KLIMOVICH and PELAGEYA KLIMOVICH, | ) ) ) | NO. 69938-5-I |
| Appellants, | ) ) ) | DIVISION ONE |
| v. | ) ) ) | |
| STATE OF WASHINGTON, DEPARTMENT OF SOCIAL & HEALTH SERVICES, | ) ) ) ) | UNPUBLISHED OPINION<br><br>FILED: August 11, 2014 |
| Respondent. | ) ) ) | |

COURT OF APPEALS DIV I
STATE OF WASHINGTON
2014 AUG 11 AM 9:27
FILED

LAU, J. — Fyodor and Pelageya Klimovich[1] appeal the Department of Social and Health Services' decision to terminate the "individual provider" contracts of their in-home care providers, Ivan Kozorezov and Larisa Kozorezova.[2] The Department terminated their contracts based on a finding that the provider's inadequate performance or inability to deliver quality care jeopardized the client's health, safety, and well-being. On appeal,

---

[1] Fyodor Klimovich died on February 24, 2011.

[2] For clarity, we refer to Ivan Kozorezov and Larisa Kozorezova by their first names. Ivan and Larisa are husband and wife.

Pelageya Klimovich assigns error to finding of fact 38 and related conclusion of law 8. Because substantial evidence supports the challenged finding, the findings support the challenged conclusion, and Klimovich fails to show that the decision was arbitrary and capricious, we affirm the final decision and order terminating the individual provider contracts.

## FACTS

Beginning in 2005, state-licensed home care agency Chesterfield Home Care Services employed Ivan and Larisa to provide in-home care for Larisa's mother, Pelageya Klimovich, and for her stepfather, Fyodor Klimovich. In May 2009, a new state law discontinued funding for in-home care performed by family members of home care agency clients. LAWS OF 2009, ch. 571, § 1, codified as RCW 74.39A.326. This new law required family members to contract directly with the Department as individual providers in order to continue working as paid care givers. In June 2009, Ivan and Larisa agreed to sign individual provider contracts in order to continue as care givers for the Klimoviches.

In early July 2009, Bruk mailed paperwork to the Klimoviches at the address the Department had on file for them. The postal service returned the documents, indicating the Klimoviches had moved. Bruk called Larisa to find out what happened. Larisa explained that she changed the Klimoviches' mailing address to her own home address because their mail was getting lost or stolen. When Bruk visited the Klimoviches' home on July 27, 2009, she discovered that it was vacant. Bruk called the Klimoviches' telephone number, but it was disconnected. On July 29, 2009, Bruk confronted Larisa about the discrepancy. Larisa informed Bruk that the Klimoviches moved to a new

home, next door to Ivan and Larisa's home. Larisa apologized and blamed the failure to report the address change on her "fear of spies, who are watching them all the time, like in Russia." Certified Appeal Board Record (CABR) at 10.

On September 28, 2009, Ivan and Larisa signed "individual provider" contracts offered directly by the Department. The contracts took effect on November 1, 2009. On November 19, 2009, the Department notified the Klimoviches that it planned to terminate the contracts, effective November 30, 2009. Amended notices to the Klimoviches dated April 5, 2010, stated the Department's rationale for the action. The Department "[found] that the provider's inadequate performance or unwillingness to deliver quality care is jeopardizing your health, safety, or well-being" and also because it "determined that your provider is not qualified based on character, competence, and suitability." Administrative Record (AR) at 938, 944. The amended notices also described a number of alleged problems, including Ivan and Larisa's alleged failure to notify the Department about the Klimoviches' relocation to a different residence. The Department specifically alleged, "Larisa has repeatedly falsified information . . . about: [The Klimoviches] moving to a new address; or of changes of with whom you lived and where the services were provided." CABR at 946.

The Klimoviches requested an administrative hearing to appeal the Department's termination of Ivan and Larisa's individual provider contracts.[3] After a series of hearings, an administrative law judge (ALJ) upheld the terminations. In October 2011, a Department review judge affirmed the ALJ's order. Among other conclusions of law, the

_____

[3] WAC 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 specifies that the right to appeal termination of an individual provider contract belongs to the client and not the individual provider.

judge ruled, "Because of [Ivan and Larisa's] inability to truthfully communicate with the Department regarding the [Klimoviches'] continued physical location, the Department properly denied the [Klimoviches] their choice of individual providers and correctly terminated [Ivan and Larisa's] individual provider contracts." CABR 16.

Fyodor Klimovich died on February 24, 2011. In January 2013, the superior court denied Pelageya Klimovich's petition for judicial review. Klimovich appeals the Department review judge's final decision and order.

## ANALYSIS

The Administrative Procedure Act, chapter 34.05 RCW, governs review of agency decisions. "We apply the standards of RCW 34.05 directly to the record before the agency, sitting in the same position as the superior court." City of Redmond v. Cent. Puget Sound Growth Mgmt. Hearings Bd., 136 Wn.2d 38, 45, 959 P.2d 1091 (1998). The burden rests on Klimovich to demonstrate the invalidity of the agency's action. RCW 34.05.570(1)(a). We will grant relief from the Department review judge's order if "[t]he order is not supported by evidence that is substantial when viewed in light of the whole record before the court . . . ." RCW 34.05.570(3)(e). We will also grant relief if "[t]he order is arbitrary or capricious." RCW 34.05.570(3)(i).

Under the substantial evidence test, we uphold challenged findings when they are supported by a sufficient quantity of evidence to persuade a fair-minded person of their truth or correctness. Raven v. Dep't of Soc. & Health Servs., 177 Wn.2d 804, 817, 306 P.3d 920 (2013). Unchallenged findings are verities on appeal. Tapper v. Emp't Sec. Dep't, 122 Wn.2d 397, 407, 858 P.2d 494 (1993). "When reviewing factual issues, the substantial evidence standard is highly deferential to the agency fact finder."

Chandler v. Office of Ins. Comm'r, 141 Wn. App. 639, 648, 173 P.3d 275 (2007). The

fact finder's credibility determinations are not subject to review. Thomas v. Dep't of

Emp't Sec., 176 Wn. App. 809, 813, 309 P.3d 761 (2013) ("A reviewing court will not

substitute its judgment for that of the agency regarding witness credibility or the weight

of the evidence."). After reviewing the findings for substantial evidence, we review de

novo whether the challenged conclusions of law flow from the findings. Cantu v. Dep't

of Labor & Indus., 168 Wn. App. 14, 21, 277 P.3d 685 (2012).

Klimovich assigns error to one finding of fact:

> 38. [Department witnesses] Karen Heeney, Elena Bruk, and Vincent Guerra, all testified that it is the case manager's duty to monitor the health, safety, and well-being of the client and to maintain an accurate Plan of Care to meet the client's needs. [Ivan and Larisa's] failure to notify the Department of the Appellants' move to the 206 address deprived the Department of the ability to monitor the health, safety, and well-being of the Appellants and to ensure that their care plan was accurate and that their care needs were met.

CABR 10. Our review of the record shows substantial evidence supports this finding.

The review judge found that Department case manager Elena Bruk and

Chesterfield case manager Hanna Hatalskaya provided credible testimony supporting

the Department's allegation that Ivan and Larisa failed to update the Klimoviches'

address during an approximately four-week period in July 2009:

> 26. Ms. Bruk testified that she first became aware of a possible change in address when the results from a May 26, 2009, annual assessment, were returned in the mail on July 14, 2009. Ms. Bruk testified that the returned documents contained a forwarding address of 206 175th Avenue, Shoreline, WA. Ms. Bruk testified that she contacted Larisa Kozorezova by telephone on July 14, 2009, and was informed that it was a mailing address only, but that the Appellants were still living at the 5th Avenue address.
> 27. Larisa Kozorezova testified at hearing that she provided a letter to Ms. Bruk notifying her of the move during the May 26, 2009, in-home assessment, and that Ms. Bruk took the letter with her when she left. Pelageya Klimovich was

present during this meeting and testified that she observed Larisa present the letter to Ms. Bruk.

28. In her testimony, Ms. Bruk denied that she was informed, either verbally or in writing, about the move. Her SER notes do not indicate that she received notice and she did not change the Appellants' address in the Department computer system.

29. Ivan and Larisa Kozorezov testified at the hearing that the Department was faxed a letter regarding the Appellants' move. They also testified that they had a fax confirmation; however, the fax confirmation was never submitted as evidence.

30. Ivan Kozorezov testified that he submitted three letters to Chesterfield regarding this move. He testified that these letters were hand delivered with his timesheets at the beginning of May, June, and July 2009. Chesterfield employees Jared Othieno, Yan Deretsky, and Hanna Hatalskaya all testified that they did not receive the letters and that the letters were not in the Appellants' Chesterfield files.

31. Hanna Hatalskaya became the Chesterfield case manager in May or June 2009, after Yan Deretsky was terminated. She testified that the Kozorezovs notified her of the move during a home visit on August 1, 2009. Ms Hatalskaya also testified that Department case manager Elena Bruk notified her of the move on July 29, 2009.

32. Because the testimony of the parties conflicted on material points, the ALJ was required to make a credibility finding. The ALJ, having carefully considered and weighed all the evidence, including the demeanor and motivations of the parties, the reasonableness of the testimony, and the totality of the circumstances presented, resolved the conflicting testimony in favor of the Department's testimony. This finding was based on the lack of evidence to establish that notice was given to either the Department or Chesterfield. The Appellants were unable to produce any additional evidence proving that any notice of a change of address was provided to the Department prior to July 29, 2009. Larisa Kozorezova's testimony that she provided at least one notice to Elena Bruk was not confirmed by the testimony or the contemporaneous SER notes of Ms. Bruk, or by any fax confirmation or other written proof of notice to the Department. There is no logical reason why Ms. Bruk would not have entered new address information into the system if she had received it. Similarly, the lack of proof of any of the three written notices to Chesterfield brings that testimony into question. If notice had been provided to Chesterfield in May 2009, the additional notices should not have been necessary. The current and former Chesterfield employees who provided testimony at the hearing were unable to confirm that these notices were ever received. Evidence presented at hearing established that Chesterfield was undergoing extensive reorganization and employee turnover during this time period. Despite the upheaval at Chesterfield, the ALJ and Review Judge both find it unlikely that three letters would be misplaced.

33. Based on the foregoing credibility finding, the ALJ and Review Judge have determined that both the Department and Chesterfield became aware that the Appellants had moved to the 206 address on July 29, 2009. However, if Ms. Bruk had not discovered the move, it is unclear how long the Department and Chesterfield would have been unaware of the Appellants' physical residence.

CABR 7-9. Klimovich does not challenge these findings.

The review judge's unchallenged findings further show that Larisa intentionally lied when asked by Bruk about the address change:

35. The Department alleges that Larisa Kozorezova lied to Ms. Bruk about the Appellant's address. On or about July 14, 2009, Ms. Bruk received returned documents mailed to the Appellants. These documents reflected that the Appellants' address had changed. Ms. Bruk called Larisa Kozorezova and asked her about it. Ms. Bruk's testimony and SER notes establish that Ms. Kozorezova told her that the Appellants' mail was being stolen and that their mailing address had been changed so that their mail would be received at the Kozorezov residence. Ms. Bruk's testimony and SER notes establish that Ms. Kozorezova told her that although the Appellants' mailing address had changed, their physical address had not. According to Ms. Bruk's testimony and contemporaneous SER Note, on July 27, 2009, she drove by the Appellants' apartment and found it empty with a few gallons of paint and a couple of ladders on the floor. The floor was covered by a plastic sheet and there was no furniture in the apartment. Ms. Bruk's subsequent SER notes indicate that when she confronted Larisa Kozorezova about misreporting the Appellants' address, Ms. Kozorezova apologized for her deception and expressed her "fear of spies, who are watching them all the time, like in Russia."

36. Larisa Kozorezov denies that she misled the Department about the address or that she apologized to Ms. Bruk for misleading her.

37. The ALJ and Review Judge, having carefully considered and weighed all the evidence, including the demeanor and motivations of the parties, the reasonableness of the testimony, and the totality of the circumstances presented resolves this conflicting testimony in favor of the Department's testimony. Although it is unclear why Larisa Kozorezov misrepresented the address of the Appellants to the Department, it is more likely than not that she did. To find otherwise would require a finding that Ms. Bruk intentionally fabricated, in great detail, the facts set forth in her SER notes. There is no logical reason why she would place her employment at risk in such a manner.

CABR at 9-10.

The above-quoted findings, together with other unchallenged record evidence, establish the following timeline of undisputed events:

| | |
|---|---|
| July 1, 2009 | The Klimoviches move from 17503 5th Avenue NE to 206 NE 175th Street (both addresses in Shoreline, Washington). At the time, Ivan and Larisa work for Chesterfield Home Care Services, a licensed private home care agency. |
| July 14, 2009 | Department case manager Elena Bruk receives returned mail sent undelivered to 17503 5th Avenue NE. The returned mail contains a forwarding address of 206 NE 175th Street. Bruk phones Larisa to inquire about the address change. Larisa falsely claims that 206 NE 175th Street is a "mailing address only" and that the Klimoviches still reside at 17503 5th Avenue NE. CABR 7. |
| July 29, 2009 | The Department confirms that the Klimoviches have moved to 206 NE 175th Street. When Bruk confronts Larisa about the discrepancy, Larisa apologizes for her deception and blames the incident on her "fear of spies, who are watching them all the time, like in Russia." CABR 10. Bruk updates the Department's database to reflect the correct address. |
| Sept. 28, 2009 | Ivan and Larisa sign individual provider contracts offered by the Department. |
| Nov. 30, 2009 | The Department terminates the contracts. |

We conclude substantial evidence supports the challenged finding stating that Ivan and Larisa failed to "notify the Department of the Appellants' move to the 206 address . . . ." and that the address change incident "deprived the Department of the ability to monitor the health, safety, and well-being of the Appellants and to ensure that their care plan was accurate and that their care needs were met." CABR 10.

Bruk testified that one of her responsibilities was to supervise individual providers:

> Q. Can you please share with us what your duties and responsibilities are as a case manager?

-8-

A. As a case manager, I am in charge of my caseload. I'm visiting face to face clients with annual assessment, significant change reassessment, if necessary and—and also 30 day visits of new clients.

Q. Is it your responsibility as a case manager to provide oversight for the services provided to our clients?

A. Yes.

Q. Do you, as a case manager, monitor individual provider and agency home care providers [sic] services provided to our clients?

A. Yes.

Report of Proceedings (RP) (Feb. 7, 2011) at 32-33. She also testified that the address change incident impaired her ability to monitor the Klimoviches, thereby jeopardizing the Klimoviches' health, safety, and welfare:

Q. ... So, how did the provider's inability to notify you of the address change impact the health, safety or wellbeing of the clients?

A. Um, the client, um moved to a new setting, which we [were] not aware of. And there is, um, access to emergency services? How the client will act in case of an emergency? If there [is] any emergency plan evacuation? If client is getting all the medications in the new setting? And, um, if client's eating the meals because of the diseases, illnesses he or she has? And, um, if client is safe?

. . . .

Q. So, do you have concerns about the health, safety or wellbeing of a client if the provider's not being truthful to you about what's going on?

A. Yes. Yes.

RP (Feb. 7, 2011) at 73-75.

Bruk's supervisor, Karen Heeney, testified similarly about the address change incident. She explained the incident left the Department unable to determine whether the Klimoviches' needs were being met:

Q. Um, why were you concerned about the issue in regards to the address, uh, information not being provided to the Department?

A. Um, we—we did not know where the clients lived.

Q. And—and why is that concerning?

A. Well, we are required to know and monitor, um, you know, where the clients are and—and the purpose of that would be to, you know, be able to monitor that, um, their needs are being met and they're getting the services, um, that they're authorized for.

> Q. Is there a concern about, uh, the accuracy of the care plan if you don't know where the clients are residing in their living environment?
> A. Moving is a significant change. The care assessment and care planning are based on, um, what the client needs in their particular environment. We develop that plan of care, um, you know, based on, um, what their needs are where they're living. So, if I don't know where they're living and what, um, the circumstances are that they're living in, um, you know, I can't—I can't tell you whether their needs are being met.
> A case manager would want to make sure that, um, a client has uh, a functioning toilet or a working refrigerator. Do they have, um, stairs that they need to navigate? Are they able to evacuate in case of emergency? Can they access the bathroom? Those are some of the issues that are identified in that particular care plan.

RP (Feb. 11, 2011) at 67-68.

Further, the review judge entered unchallenged findings showing that the

Klimoviches suffered from poor health:

> 2. Prior to his death on February 24, 2011, Mr. Klimovich had complex medical needs. Pursuant to his last CARE assessment in 2009, he suffered from congestive heart failure, hypertension, osteoarthritis, neuropathy, angina, cardiac dysrhythmia, COPD, and non insulin dependent diabetes.
> . . . .
> 4. Mrs. Klimovich has complex medical needs. Pursuant to her last CARE assessment in 2009, she suffered from hypertension, osteoarthritis, coronary artery anomaly, angina, and difficulty with non insulin dependent diabetes.

CABR 2.

Based on the testimony of Bruk and Heeney and other undisputed record

evidence, we conclude substantial evidence supports challenged finding 38.

We also conclude that the challenged conclusion of law quoted below is

supported by the findings of fact:

> 8. The evidence presented at the hearing supported the Department's decision to terminate the Kozorezovs' contracts to provide the Appellants' individual care services, pursuant to WAC 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. The hearing evidence clearly established that the Kozorezovs moved the Appellants to a different home and address, and intentionally failed to notify the Department of the change. Not

-10-

only did these actions violate the requirements outlined in WAC 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, they clearly supported the Department's reasonable, good faith belief that the Kozorezovs lacked the requisite judgment to appropriately meet the Klimovichs' needs, pursuant to WAC 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. Additionally, the Kozorezovs' failure to truthfully communicate with the Department restricted its ability to provide oversight of the Appellants' complex medical needs and jeopardized the Appellants' health, safety, and well-being. Because of the Kozorezovs' inability to truthfully communicate with the Department regarding the Appellants' continued physical location, the Department properly denied the Appellants' their choice of individual providers and correctly terminated the Kozorezovs' individual provider contracts.

CABR 16 (footnote omitted).

Klimovich also argues the Department "misapplied the law regarding terminable offenses." Br. of Appellant at 18. "We give substantial weight to an agency's interpretation of the law within its expertise, such as regulations the agency administers." Marcum v. Dep't of Soc. & Health Servs., 172 Wn. App. 546, 559-60, 290 P.3d 1045 (2012). Under RCW 74.39A.095(7), the Department may terminate an individual provider's contract upon the case manager's finding that the provider's "inadequate performance or inability to deliver quality care is jeopardizing the health, safety, or well-being of a consumer receiving service under this section. . . ." Former WAC 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 (2009) provides a nonexclusive list of examples of circumstances indicating jeopardy to the client:

> (1) Domestic violence or abuse, neglect, abandonment, or exploitation of a minor or vulnerable adult;
> (2) Using or being under the influence of alcohol or illegal drugs during working hours;
> (3) Other behavior directed toward the client or other persons involved in the client's life that places the client at risk of harm;
> (4) A report from the client's health care provider that the client's health is negatively affected by inadequate care;
> (5) A complaint from the client or client's representative that the client is not receiving adequate care;

      (6) The absence of essential interventions identified in the service plan, such as medications or medical supplies; and/or

      (7) Failure to respond appropriately to emergencies.

Former WAC 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 (2009).

Klimovich argues that WAC 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 describes conduct that clearly places the client at serious risk of probable harm. Noting that there is no evidence that she or her late husband endured stress or neglect at the hands of Ivan and Larisa, Klimovich contends that the address change incident does not rise to the level of the examples offered in this regulation. We disagree. The exemplar grounds for termination listed in former WAC 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 (2009) are expressly "without limitation." They are illustrative factors that the Department may consider in exercising its discretion to terminate an individual provider contract where "inadequate performance or inability to deliver quality care is jeopardizing the health, safety, or well-being of a consumer receiving service under this section . . . ." RCW 74.39A.095(7). There is no language in RCW 74.39A.095(7) or WAC 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 requiring the Department to prove that the Klimoviches suffered actual harm.

The Department asserts that the contracts were properly terminated under these standards because it can no longer trust Ivan and Larisa to promote Klimovich's health, safety, and well-being. As the ALJ stated in the corrected initial order:

> [t[his act breached the trust that must exist between the Department and care providers, and it reasonably caused the Department to question all other information provided to it by the Kozorezovs. . . . If the Department is unable to reliably monitor the care received by its clients, there is no way to ensure adequate care, or to diagnose and prevent abuse or other harm. This places the health, safety and well-being of the Appellants at risk.

AR at 89.

In upholding the terminations, the review judge noted that the hearing evidence clearly established that both Ivan and Larisa intentionally failed to notify the Department of the Klimoviches' address change, in violation of WAC 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. It concluded that "the Kozorezovs' failure to truthfully communicate with the Department restricted its ability to provide oversight of the Appellants' complex medical needs and jeopardized the Appellants' health, safety, and well-being." AR at 16. The Department properly applied the law, and the challenged conclusion is supported by the findings.

The review judge further ruled that the incident "clearly supported the Department's reasonable, good faith belief that the Kozorezovs lacked the requisite judgment to appropriately meet the Klimovichs' needs, pursuant to WAC 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." CABR 16. Former WAC 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 (2009) provided, "The department . . . may reject a client's request to have a family member or other person serve as his or her individual provider if the case manager has a reasonable, good faith belief that the person will be unable to appropriately meet the client's needs." Klimovich does not challenge the review judge's reliance on former WAC 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 (2009) as a basis for termination.

Klimovich next argues the review judge's order was arbitrary and capricious because Bruk was hostile to Ivan, Larisa, and the Klimoviches. This claim fails for two reasons. First, Klimovich fails to cite the record to support this allegation, as required by RAP 10.3(a)(6). Second, even assuming Bruk disliked Ivan, Larisa, and the Klimoviches, that alone fails to demonstrate that the review judge's order was arbitrary and capricious. "To find an agency's decision to be arbitrary and capricious we must conclude that the decision is the result of wilful and unreasoning disregard of the facts and circumstances." Providence Hosp. of Everett v. Dep't of Soc. & Health Servs., 112

-13-

Wn.2d 353, 356, 770 P.2d 1040 (1989). "[O]ne who seeks to demonstrate that action is arbitrary and capricious must carry a heavy burden." Pierce County Sheriff v. Civil Serv. Comm'n of Pierce County, 98 Wn.2d 690, 695, 658 P.2d 648 (1983). The review judge's findings demonstrate that the Department terminated the contracts after due consideration of the material circumstances, including Ivan's failure to update the Klimoviches' address and Larisa's lie about the address.[4] Klimovich continues to argue that the misconduct did not justify termination, but "neither the existence of contradictory evidence nor the possibility of deriving conflicting conclusions from the evidence renders an agency decision arbitrary and capricious." Rios v. Wash. Dep't of Labor & Indus., 145 Wn.2d 483, 504, 39 P.3d 961 (2002).

Klimovich further contends the order was arbitrary and capricious because the record shows the Department delayed the terminations until several months after the misconduct occurred. She claims no logical explanation justified the delay. We conclude evidence of the delay did not render the review judge's order arbitrary or capricious. First, we note that the address change incident was one of several misconduct claims involving Ivan and Larisa. The complexity of the case explains at least part of the delay. Second, our record indicates that in mid to late 2009, the Department had a higher than average workload as it attempted to negotiate individual provider contracts with care givers who, like Ivan and Larisa, were previously employed by home care agencies. Heeney testified it was "a very hectic time at [the City of Seattle Aging Disability Services Division] with the addition of, you know, 1,400 new

---

[4] As noted above, the review judge rejected Ivan's testimony that he hand delivered three letters about the move to Chesterfield. The review judge also rejected Ivan and Larisa's testimony that they faxed a letter about the move to the Department.

providers . . . ." RP (Feb. 11, 2011) at 68. Additionally, the review judge entered an unchallenged finding of fact describing the lengthy recontracting process:

> 15. The transition from agency provider ("AP") to individual provider ("IP") required a re-contracting process. HCAs [Home care agencies] provided a list of names of clients being provided in-home care by family members. Department case managers then asked clients if they wanted to maintain their family member as their in-home care provider. If the clients and the providers agreed to have the providers become IPs, the Department's administrative staff reviewed the providers paperwork from the HCAs to ensure that the provider's training was up to date and that there was no disqualifying criminal history. If the HCA paperwork for the provider did not reveal training or criminal history issues, the provider was invited to an orientation by the Department. At the orientation, the provider reviewed and signed the IP contract. Once the IP contract was signed, Department administrative staff notified the Department case manager assigned to the client. The case manager would then notify the client. If the provider did not have a criminal history, the Department did not interview the provider, consult the case manager or conduct a Character, Competency and Suitability review.

CABR 4. On this record, it appears the delay was largely administrative. Klimovich fails to demonstrate that the review judge's order resulted from willful and unreasoning disregard of the facts and circumstances. Providence Hosp., 112 Wn.2d at 356.

Klimovich next argues that by terminating Ivan and Larisa's individual provider contracts, the Department violated her due process rights. She contends that Bruk's contempt for the Klimoviches and their care givers, in addition to the Department's delay in taking action to cancel the contracts, demonstrates that the Department's stated concern for the Klimoviches' health, safety and well-being was arbitrary and pretextual. "To constitute a protected interest requiring due process protection, a government action must 'constitute the impairment of some individual's life, liberty, or property.'" Weyerhaeuser v. Pierce County, 124 Wn.2d 26, 54, 873 P.2d 498 (1994) (quoting Ronald D. Rotunda & John E. Nowak, Treatise on Constitutional Law: Substance and Procedure § 17.2 (2d ed. 1992)). Citing Board of Regents v. Roth, 408 U.S. 564,

-15-

577, 92 S. Ct. 2701, 33 L. Ed. 2d 548 (1972), Klimovich asserts that she and her late husband were third party beneficiaries of Ivan and Larisa's individual provider contracts. Roth held that an untenured professor hired at a state university for a one-year term was not entitled to additional process after the university, without providing a hearing or an explanation, declined to rehire him for the following academic year. Roth provides no support for Klimovich's due process argument. And Klimovich provides no further analysis of the issue. "Parties raising constitutional issues must present considered arguments to this court." State v. Johnson, 119 Wn.2d 167, 171, 829 P.2d 1082 (1992). Klimovich's argument on this issue falls well below the level needed to warrant further consideration.

Klimovich next argues that the judge was "arbitrary and capricious in the test he used for discerning the truth," since he gave Bruk the "benefit of the doubt."[5] Br. of Appellant at 29. She contends the judge "made an arbitrary credibility determination, finding that Ms. Bruk was not notified of Mr. and Mrs. Klimovich's move in a timely fashion." Br. of Appellant at 29. We disagree. Faced with conflicting testimony, the judge was required to credit certain facts and to reject others. Nothing in our record suggests the Department benefitted from any undue favoritism. Moreover, the judge's credibility determinations are not subject to review. Thomas, 176 Wn. App. at 813.

Klimovich also alleges the review judge should have considered the decision to terminate Ivan's contract separately from Larisa's contract. Our review of the record

---

[5] In making this argument, Klimovich purports to challenge findings of fact 32 and 37. But she assigned no error to those findings. Under RAP 10.3(g), "A separate assignment of error for each finding of fact a party contends was improperly made must be included with reference to the finding by number." As discussed above, Klimovich properly challenged only finding of fact 38.

shows the judge properly distinguished between evidence of Ivan's misconduct and that of Larisa. Although his findings focus on Larisa's dishonesty, they make clear that Ivan and Larisa independently committed misconduct justifying termination. Both Ivan and Larisa had a responsibility to notify the Department immediately when the Klimoviches moved. The review judge found that both Ivan and Larisa "intentionally" failed to notify the Department of the Klimoviches' change of address. AR 16. The judge also found that Larisa provided false information to the Department regarding the Klimoviches' address but that Ivan did not misrepresent the address. The review judge did not "paint[ ] Ivan [and Larisa] with the same brush" as Klimovich alleges. Br. of Appellant at 28. The record shows that the judge considered the evidence against each of them separately in reaching his decision.

## CONCLUSION

The findings are supported by substantial evidence, and the conclusions of law flow from the findings. The Department's decisions were not arbitrary and capricious. We therefore affirm the final decision and order terminating the individual provider contracts.

WE CONCUR: