# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| TANJIA DAVIS, | ) |
| | ) No. 75422-0-I |
| Appellant, | ) |
| | ) DIVISION ONE |
| v. | ) |
| | ) |
| STATE OF WASHINGTON, DEPARTMENT | ) UNPUBLISHED OPINION |
| OF SOCIAL AND HEALTH SERVICES, | ) |
| | ) |
| Respondents. | ) FILED: October 2, 2017 |
| | ) |

SPEARMAN, J. – Tanjia Davis permitted the three grandchildren in her custody to spend the night with unauthorized caregivers and then delayed contacting the Department of Social and Health Services (Department) or law enforcement upon learning that the children's mentally ill mother had abducted them. Because the record supports the determination that Davis's actions constituted a serious disregard of the consequences to the children of such magnitude that it created a clear and present danger to the children's health, welfare or safety, we affirm the Department's finding of negligent treatment.

## FACTS

Davis has not assigned error to any of the Department's findings of fact. The findings are therefore verities on appeal and establish the following sequence of events. See Darkenwald v. Emp't Sec. Dep't, 183 Wn.2d 237, 244, 350 P.3d 647 (2015).

On March 23, 2012, the Department filed a dependency petition on behalf of Constance Ford's three children, who were approximately three, eight and ten.

Appellant Tanjia Davis is Ford's mother. Ford was suffering from "severe, non-medicated mental illness, as well as chronic substance abuse. . . ."[1] Davis informed Child Protective Services (CPS) that Ford had recently assaulted several family members, stopped taking her medication, and was using drugs and alcohol. Davis and her other daughter, Kiera Davis, also alleged that Ford had slapped the children at times. After the shelter care hearing on March 26, 2012, the Department placed the three children with Davis.

On May 7, 2012, the Department served Davis with a finding of negligent treatment or maltreatment of her grandchildren. The finding was based on evidence that Davis left the children in the care of relatives who lacked the requisite background checks and then delayed reporting that Ford had abducted the children. An internal Department review affirmed the finding.

Davis requested a hearing to challenge the neglect finding. After the hearing on February 25, 2015, the Administrative Law Judge (ALJ) issued an initial order upholding the Department's finding of negligent treatment. On April 7, 2015, a Department review judge issued a review decision and final order affirming the ALJ's initial order and adopting, in pertinent part, the ALJ's findings of fact and credibility assessments. The superior court denied Davis's petition for judicial review.

The order of dependency permitted only supervised contact between Ford and her children. When discussing the placement of the three grandchildren, Sabrina Eldridge, the assigned CPS social worker, informed Davis that anyone who had unsupervised contact with the children must first complete a background check.

---

[1] Findings of Fact (FF) 3, Certified Appeal Board Record (CABR) at 17.

Eldridge expressly told Davis that this meant no relative, including Davis's other daughter, could babysit or keep the children overnight without a background check.

Eldridge handed Davis the background check forms for each relative present at a late March 2012 meeting. Each person living with Davis, including Davis's husband, 17 year old son, and daughter Kiera, had completed a background check at the time the Department placed the children with her. Davis had already completed a background check to become a licensed adult family home care provider.

Davis reported that shortly after the Department placed the children with her, she saw Ford "'stalking the neighborhood,'" wearing a mask, and "'singing Jesus songs in the street.'"[2] On April 6, 2012, during a supervised visit with the children, Ford assaulted Davis. Davis then obtained a domestic violence no contact order against Ford.

On Saturday, April 14, 2012, Davis permitted the three children to attend an overnight birthday party at a paternal relative's residence. Ford showed up during the party and absconded with the children. Federal marshals found the children several weeks later and returned them to the Department's custody. None of the relatives present at the party had completed background checks.

At the ALJ hearing, Davis testified that she called social worker Eldridge several days before the party and that Eldridge said it was "'ok'"[3] for the children to attend as long as Ford was not present. Davis also claimed that she informed Regina Hawkins, the children's paternal aunt and a sponsor of the birthday party, that Ford could have no contact with the children. According to Davis, Hawkins assured her

---

[2] FF 11, CABR at 19.

[3] FF 15, CABR at 21.

that Ford was not invited to the party and that no one had told Ford about the party. But a cousin apparently told Ford about the party and when she appeared, the relatives allowed her in.

Davis testified that she and Kiera dropped the children off for the party at about 4:00 p.m. on Saturday. Davis maintained that the initial plan was for Kiera to pick the children up after work at about 7:30 p.m. Davis then claimed that on Saturday evening, one of the relatives called to say the party was running late. At the relative's request, Davis gave her approval for the children to spend the night.

Kiera Davis, however, testified that she arrived after work at about 11:00 p.m. on Saturday to pick up the children. Kiera rang the bell and called the relatives, but no one opened the door. At this point, Kiera decided "'they were all in bed, and the children would just spend the night.'"[4] Upon arriving home, Kiera assured her mother that the children were sleeping and "'that we'll go back first thing in the morning.'"[5]

On Sunday, both Davis and Kiera were admittedly very worried about the children. They claimed that they were unable to reach any of the relatives by phone, and Kiera testified that she returned to the home twice on Sunday, but no one answered the door. Kiera also telephoned other relatives throughout the day on Sunday, attempting to find the children. Kiera acknowledged that "'[w]e were up all [Sunday] night trying to figure something out, calling out people, and sending out messages . . . .'"[6]

---

[4] FF 17, CABR 21.

[5] Clerk's Papers (CP) at 156.

[6] CP at 166.

On Monday morning, Davis called Eldridge and told her the children were supposed to be at a paternal relative's home, but could not be found. Davis said she had not yet called the police earlier because she first wanted to give her daughter "the benefit of the doubt"[7] to return the children on her own. At Eldridge's direction, Davis immediately reported the abduction to the police. When federal marshals found the children on May 2, 2012, they did not appear to be abused or visibly harmed.

At the ALJ hearing, Davis insisted that she did not learn of the kidnapping until Monday morning and then promptly notified Eldridge. The review judge adopted the ALJ's assessment that this claim was not credible in light of the significant discrepancies between Davis's account of providing permission on Saturday for the children to spend the night and Kiera's attempts to pick the children up late Saturday night, the acknowledged concern and attempts of both Davis and Kiera to find the children on Sunday, and Davis's account when she reported the abduction to the police on Monday:

> The Appellant's story that she approved an overnight stay on Saturday is, more likely than not, an attempt to cover the fact that she knew the children were missing, or were not where they should be, on Saturday night by around 11 p.m.[8]

The review judge found that the paternal relatives had informed Davis that the children were missing no later than Sunday. The review judge also rejected Davis's assertion that Eldridge had given her permission for the children to attend the birthday party, noting that Eldridge's extensive and detailed case notes provided no support for this claim.

---

[7] FF 25, CABR at 24.

[8] FF 21, CABR at 23.

Ford also testified at the administrative hearing. She asserted that she arrived at the party on Saturday afternoon and then spent Saturday night and all day Sunday at the home before leaving with the children at about 3:00 a.m. on Monday. The review judge found Ford's account not credible in light of the evidence that Davis and Kiera discovered the abduction no later than Sunday.

The review judge concluded that Davis's failure to contact the Department immediately upon learning that Ford had abducted the children, as well as her actions in permitting the children to be supervised by persons who had not completed a background check, constituted negligent treatment or maltreatment of the children.

Davis appeals.

## DISCUSSION

The Washington Administrative Procedure Act (APA), chapter 34.05 RCW, governs judicial review of agency actions. Postema v. Pollution Control Hr'gs Bd., 142 Wn.2d 68, 76-77, 11 P.3d 726 (2000). We review an agency order in adjudicative proceedings under RCW 34.05.570(3), which provides, in part, that we will grant relief only if the agency has erroneously interpreted or applied the law, or if the order is unconstitutional, is outside the statutory authority of the agency, is not supported by substantial evidence, or is arbitrary or capricious. Our review is limited to the Department's final order, not the ALJ's initial order or the superior court's order. See Tapper v. Employment Sec. Dep't, 122 Wn.2d 397, 403-04, 858 P.2d 494 (1993).

We review findings of fact to determine whether, considering the record as a whole, the evidence is sufficient to persuade a fair minded person of the matter. Mowat Const. Co. v. Department of Labor and Industries, 148 Wn. App. 920, 925,

-6-

201 P.3d 407 (2009). As indicated, because Davis has not assigned error to the agency's findings of fact, the findings are verities on appeal.[9]

We review questions of law, and the agency's application of the law to the facts, de novo, but we afford "great weight" to the agency's interpretation of law "where the statute is within the agency's special expertise." Cornelius v. Dep't of Ecology, 182 Wn.2d 574, 585, 344 P.3d 199 (2015). We do not weigh witness credibility or substitute our judgment for the agency's findings of fact. Port of Seattle v. Pollution Control Hr'gs Bd., 151 Wn. 2d 568, 588, 90 P.3d 659 (2004). "The burden of demonstrating the invalidity of agency action is on the party asserting invalidity." RCW 34.05.570(1)(a).

Under RCW 26.44.020(1), the definition of abuse or neglect includes, among other things, "the negligent treatment or maltreatment of a child by a person responsible for or providing care to the child." Negligent treatment or maltreatment includes:

> [A]n act or a failure to act, or the cumulative effects of a pattern of conduct, behavior, or inaction that evidences a serious disregard of consequences of such magnitude as to constitute a clear and present danger to a child's health, welfare, or safety, including but not limited to conduct prohibited under RCW 9A.42.100.

RCW 26.44.020(16).

The Department has also adopted a regulation defining "negligent treatment or maltreatment":

> (5) Negligent treatment or maltreatment means an act or a failure to act, or the cumulative effects of a pattern of conduct, behavior, or inaction, on the part of a child's parent, legal custodian,

---

[9] In any event, substantial evidence supports the relevant findings.

guardian, or caregiver that shows a serious disregard of the consequences to the child of such magnitude that it creates a clear and present danger to the child's health, welfare, or safety. A child does not have to suffer actual damage or physical or emotional harm to be in circumstances which create a clear and present danger to the child's health, welfare, or safety. Negligent treatment or maltreatment includes, but is not limited, to:

(a) Failure to provide adequate food, shelter, clothing, supervision, or health care necessary for a child's health, welfare, or safety. Poverty and/or homelessness do not constitute negligent treatment or maltreatment in and of themselves;

(b) Actions, failures to act, or omissions that result in injury to or which create a substantial risk of injury to the physical, emotional, and/or cognitive development of a child; or

(c) The cumulative effects of a pattern of conduct, behavior or inaction by a parent or guardian in providing for the physical, emotional and developmental needs of a child's, or the effects of chronic failure on the part of a parent or guardian to perform basic parental functions, obligations, and duties, when the result is to cause injury or create a substantial risk of injury to the physical, emotional, and/or cognitive development of a child.

WAC 388-15-009(5). In order to satisfy the statutory definition of negligent treatment in RCW 26.44.020(16), the Department must establish more serious misconduct than simple negligence. Brown v. Dep't of Soc. & Health Servs., 190 Wn. App. 572, 593, 360 P.3d 875 (2015) (Department erred in incorporating "reasonable person" standard into finding of neglect).

On appeal, Davis argues that allowing her grandchildren to attend the birthday party at a relative's home did not amount to ordinary negligence, much less satisfy the heightened statutory standard of negligent treatment. To support this argument, Davis points to the fact that she had no notice that any "unanticipated event" might pose a risk of harm to the children, that she "took the precautionary step"[10] of obtaining Eldridge's permission before allowing the children to attend, and that the

---

[10] Brief (Br.) of App. at 2.

relative holding the party assured her that she would not let Ford attend. Davis claims that under the circumstances, she was "engaged in what would be the same child raising practices we all would engage in."[11]

But Davis's arguments rest on an incomplete, conclusory factual account that the review judge rejected in pertinent part as not credible. Contrary to Davis's assertions, the review judge found that she did not contact Eldridge before the party. The unchallenged findings also establish that Davis allowed the children to spend the night with caregivers who had not completed background checks, contrary to the Department's express instructions.

Moreover, Davis was aware that Ford was prohibited from having any unsupervised contact with the children. Davis was also well aware of Ford's severe mental health issues, chronic substance abuse, and recent erratic and assaultive behavior. Yet when she learned no later than Sunday that Ford had abducted the children, Davis failed to notify the Department or the police in an effort to give Ford "the benefit of the doubt" to return the children. Davis acknowledged the serious risk of harm to the children in her comments to the police. The concern was also reflected in her frantic efforts, along with Kiera, to contact or find the children on Sunday, efforts that continued all through Sunday night. About a week after the abduction, Davis called and left a message for Eldridge demanding that the Department locate the children because she "did not want to be burying" her grandchildren.[12]

---

[11] Br. of App. at 3.

[12] CP at 126.

Viewed together, Davis's actions and failure to act evidenced a serious disregard of consequences "of such magnitude as to constitute a clear and present danger" to the children's health, welfare, or safety and were therefore sufficient to satisfy the statutory definition of negligent treatment or maltreatment.

Davis's reliance on Brown, 190 Wn. App. 572, Marcum v. Dep't of Soc. and Health Servs., 172 Wn. App. 546, 290 P.3d 1045 (2012), and In re Dependency of M.S.D., 144 Wn. App. 466, 182 P.3d 978 (2008), is misplaced. In Brown, the court held that the Department had erred in applying a "reasonable person" standard to the finding of neglect. The court concluded that the statutory definition of "negligent treatment" in RCW 26.44.020(16) required a higher standard of misconduct than simple negligence. In Marcum, the court vacated the Department's finding that neglect had occurred under WAC 388-15-009(5) regardless of whether the conduct created a clear and present danger to the child's safety. Here, unlike Brown and Marcum, the Department's finding of negligent treatment was based on the application of the proper standard. The review judge expressly noted that the statutory and regulatory definitions did not "relieve the Department of having to show that a particular action or failure to act constituted a serious disregard of the consequences to a child of such magnitude as to create a clear and present danger to that child's health, welfare, or safety. . . ."[13]

In M.S.D., the court reversed a dependency based on a finding that the mother negligently failed to protect her daughter from the risk posed by the mother's boyfriend. The court concluded that under the circumstances, the evidence failed to

---

[13] CABR at 34, n.64.

establish that the boyfriend's ten year old conviction constituted a risk to the child's safety. Here, however, the evidence was sufficient to establish that Davis's actions and failure to act created a clear and present danger to the children's health, safety or welfare.

In her reply brief, Davis argues for the first time that the Department's requirement that "the people throwing the party" complete background checks "in such a situation ... is an arbitrary and capricious demand on the part of the respondent."[14] Because this argument is raised for the first time in the reply brief, we decline to consider it. See Cowiche Canyon Conservancy v. Bosley, 118 Wn.2d 801, 809, 828 P.2d 549 (1992) ("An issue raised and argued for the first time in a reply brief is too late to warrant consideration.").

Affirmed.

Spelman, J.

WE CONCUR:

Mann, J.

Trickey, ACJ

---

[14] Reply Br. at 3.

-11-