144 P.3d 353 (2006)
In re the DEPENDENCY OF H.S., D.O.B.: 02/07/1990, A minor child.
Stephen Schermer, Margaret Schermer, Petitioners, and
State of Washington, Department of Social and Health Services, Respondent,
v.
H.S., Appellant.
No. 57117-6-I.
Court of Appeals of Washington, Division 1.
October 9, 2006.
*354 Cheryl Aza, Gregory Charles Link, Attorney at Law, Washington Appellate Project, Seattle, WA, for Petitioners.
Rachel Levy, Attorney at Law, Trisha L. McArdle, Office of The Atty. Gen., Seattle, WA, Christian Williams, Attorney Generals Office, Everett, WA, for Respondent.
GROSSE, J.
¶ 1 For a child to be found dependent under RCW 13.34.030(5)(c) the petitioner must show the child "[h]as no parent, guardian, or custodian capable of adequately caring for the child, such that the child is in circumstances which constitute a danger of substantial damage to the child's psychological or physical development." Here, the petitioners' evidence established a prima facie case that H.S.'s parents were incapable of adequately caring for H.S. in their home. Furthermore, the evidence established a prima facie case that H.S. was in circumstances that constituted a clear and present danger of substantial damage to his psychological or physical development due to his imminent release from an institution that could adequately meet his acute psychological needs, and his delivery into the care of his parents, who were unable to adequately care for H.S. in their home. Therefore, the trial court erred in granting the State's motion to dismiss. We reverse and remand for a full hearing.

FACTS
¶ 2 H.S. was born February 7, 1990, and has two younger siblings. Beginning in 2003, H.S. began experiencing night rages which progressively worsened to the point where his parents sought professional help. H.S. was treated by a psychologist who prescribed anti-depressants. H.S.'s symptoms continued to worsen. He became severely depressed and aggressive, began having suicidal thoughts, hearing voices, and engaged in acts of self-mutilation. His parents had him hospitalized in May 2003.
¶ 3 H.S. was diagnosed with severe depression and medications were prescribed. The doctors advised the parents that they lock potentially harmful things up in the house. They also advised that they keep stimuli such as light and noise at low levels.
¶ 4 Despite these measures the voices in H.S.'s head grew louder and his suicidal tendencies increased. H.S. was readmitted to the hospital in June 2003. The doctors attempted to treat H.S.'s symptoms by altering his medication. The family also participated in family treatment sessions. But H.S.'s symptoms continued to worsen. He was admitted to the hospital three more times in the summer and fall of 2003 after the voices in his head began telling him to kill his entire family.
¶ 5 In January 2004, H.S.'s parents sent him to Intermountain Hospital, a residential care facility in Idaho where he remained until May 2004. In March 2004, the Schermers' 5-year-old son revealed that H.S. had exposed himself to the child. H.S.'s treatment providers confronted him with this information and he acknowledged his actions.
¶ 6 In May 2004, H.S. was moved to a facility in Utah for behavioral therapy in *355 order to stabilize H.S. before he returned home. During the course of H.S.'s treatment, his parents actively participated in weekly family therapy sessions by telephone and visited him approximately every six weeks.
¶ 7 In January 2005, H.S. was found in a sexual encounter with a peer at his treatment facility. H.S. revealed that he had sexual relations with a number of peers at the facility and his treatment providers concluded that H.S. exhibited sexually predatory behavior, including grooming. Because the facility was not licensed to house sexually aggressive youth, H.S. was transferred to another facility in Utah capable of treating such youth. The professionals who worked with H.S. advised the Schermers it was not safe for H.S. to return home. They estimated H.S. needed another two to three years of treatment.
¶ 8 In January 2005, the Schermers contacted the Department of Social and Health Services (DSHS) for assistance. According to the Schermers, DSHS offered only the possibility of a door alarm and respite care if H.S. returned home.
¶ 9 In June 2005, the Schermers filed a dependency petition under RCW 13.34.040(1), stating they could not provide for H.S.'s continuing residential treatment or his mental or physical safety if he returned to their home. A hearing was held in September 2005. H.S. joined his parents in the dependency petition.
¶ 10 At the hearing, the Schermers testified as to H.S.'s psychological problems and their efforts to treat his conditions. Both parents testified that if H.S. was forced to leave the residential treatment facility due to their failure to pay overdue bills, they would be unable to provide the level of care necessary in their home to keep him safe.
¶ 11 As for the Schermers ability to pay the bills necessary to keep H.S. in the residential treatment facility in Utah, Mr. Schermer testified that he was the sole financial provider for the family, working an average of 40 to 50 hours per week outside the home. Mr. Schermer is a professional classical musician who earns his living playing for various area symphony, opera, and ballet groups. He also earns income teaching music at the University of Puget Sound and through private lessons. Mr. Schermer earned between $36,000 and $50,000 over the years preceding the petition hearing. He testified that he was unable to significantly increase his wages.
¶ 12 Ms. Schermer had not worked outside the home since H.S. was in the third grade and the Schermers' family therapist testified that Ms. Schermer was incapable of obtaining work outside of the home due to her anxiety problems.
¶ 13 Mr. Schermer estimated that the family had spent about $130,000 out of pocket to care for H.S. since the onset of his problems. They paid these bills through refinancing their home, taking out a home equity loan to the maximum amount the bank allowed, and borrowing $21,000 from Ms. Schermer's father. Mr. Schermer testified that the family was on the verge of bankruptcy. As of the date of the hearing, Mr. Schermer testified that they were two months behind in their bills to the residential treatment facility in Utah and that if the bills were not paid H.S. would be released from the facility within a couple of weeks.
¶ 14 After the Schermers and H.S. presented their case, the State moved to dismiss the dependency petition. The court granted the motion to dismiss, finding H.S. had not been abandoned, nor did the evidence show he had no parent capable of adequately caring for him so as to present a danger of substantial damage to his physical or psychological development. The court based its ruling on a finding that the Schermers had the financial ability to keep H.S. in treatment for another six months if they sold their house. The court stated in its oral ruling:
The Court does not believe that the appropriate question is, can the child safely be in the home. The appropriate question is the question posed by the statute, which is, does [H.S.] have no parent capable of adequately caring for him.
And the answer to that question from the evidence here today is in the negative. The father testified, the father testified today, September 8th, 2005, there are resources in the family that could keep [H.S.] *356 where he is for another six months. . . . That the father may choose not to devote the resources there or deem it unwise is not relevant under the statutory criteria.
Similarly, upon questioning of [H.S.], it is also clear that the evidence is that he is not presently in a place, presently, today, September 8th, 2005, in circumstances which constitute a danger of substantial damage to his psychological or physical development.
And in its written ruling the trial court stated:
There are resources within this family that would allow the parents to keep [H.S.] in his current placement for at least another six months. Sale of the family home alone, which was last appraised as being worth approximately $400,000, could free up equity that would provide for six more months of care at [H.S.'s] present placement. There are also shares of Microsoft stock[1] that the family could sell. Furthermore, there is the ability to rely on extended family members for support as evidenced by the $21,000 loan that the parents were recently granted by the mother's parents on July 20, 2005. As of the date of the hearing, the uncontested testimony was that the parents have sufficient financial resources to care for the child.
H.S. appeals.[2]

ANALYSIS
¶ 15 The issue before this court is whether the trial court erred in determining as a matter of law that H.S. was not a dependant child under RCW 13.34.030(5)(c). RCW 13.34.030(5)(c) defines a "Dependent child" as "any child who . . . [h]as no parent, guardian, or custodian capable of adequately caring for the child, such that the child is in circumstances which constitute a danger of substantial damage to the child's psychological or physical development."[3] Because the determination was made pursuant to a CR 41(b)(3) motion, and was made as a matter of law, our review is de novo viewing the evidence in the light most favorable to the nonmoving party, in this case, H.S.[4]
¶ 16 Viewing the evidence in the light most favorable to H.S., his parents were unable to adequately care for H.S. in their home. The Schermers testified extensively about H.S.'s psychological problems and their inability to care for H.S.'s needs in their home. They testified about H.S.'s night rages, his chronic depression, his acts of self-mutilation, and the fact that he was hearing voices that were telling him to kill himself and others. This testimony was corroborated by a mental health nurse practitioner who worked with the Schermers. There also was testimony indicating that H.S. was exhibiting sexual predatory behavior towards other boys, engaging in sexual contact with other boys, and that he had exposed himself to his younger brother. Mr. Schermer also testified that his current treatment providers had conducted an assessment of H.S. which concluded that at the time of the hearing it was not safe for H.S. to return home.
¶ 17 Reading the evidence in the light most favorable to H.S., H.S.'s psychological problems were so acute that he had to be placed in a residential treatment facility in order to keep him out of danger from harming himself and others. H.S. thus had no parent capable of adequately caring for him, because the only place where H.S. could receive adequate care was in an institutional setting.
¶ 18 Recently, in the case In the Matter of the Dependency of C.M.,[5] we held that a trial court's dependency finding was proper where the father's mental health issues and deficient parenting skills prevented him from fully addressing the needs of his special needs child, thus placing his child in danger *357 of substantial damage to his psychological development. We held:
While the record shows that McCracken loves C.M. and does his best to care for him, there remains substantial evidence that C.M. has developmental delays that could result in significant psychological damage if they remain unaddressed. And there is substantial evidence that McCracken's own mental illness and poor judgment have affected his ability to address these delays, despite his best intentions and his best efforts.
McCracken argues that [DSHS] did not prove that C.M. was dependent because it failed to prove that he was "currently unavailable to parent C.M.," relying on In re Welfare of Walker [, 43 Wash.2d 710, 715, 263 P.2d 956 (1953) ]. Walker is inapposite.
The definition of dependent child at issue in this case was not discussed in Walker. McCracken relies only on that court's general comment "that an existing ability or capacity of parents adequately and properly to care for their children is inconsistent with a status of dependency."[6] This principle does not conflict with the trial court's ruling here. While the evidence shows that McCracken can adequately care for C.M.'s basic needs, the trial court's finding that C.M.'s developmental needs have not been met is supported by substantial evidence, and meets both the definition of dependent child in RCW 13.34.030(5)(c) and the general principle stated in Walker.[7]
¶ 19 Likewise, in the case at bar, there was testimony that Ms. Schermer's own mental health issues prevented her from adequately meeting H.S.'s developmental needs. Mr. Schermer also was unable to do so because, as the sole provider for the family, he could not be present often enough to meet H.S.'s substantial needs.
¶ 20 The trial court saw the issue not simply as whether the Schermers had the ability to care for H.S., but as whether H.S. had any parent capable of causing him to be cared for.[8] Thus, the trial court's reasoning goes, even if the Schermers could not adequately care for H.S., they had the financial resources to pay someone else to adequately care for H.S., in this case at the residential treatment facility where he was residing at the time of the hearing. Their remaining financial resources consisted primarily of the Schermers' house that they would be forced to sell in order to keep H.S. in treatment another six months, far less time than what would be necessary for him to complete his treatment.
¶ 21 Complete parental financial destitution is not a prerequisite to a dependency determination under RCW 13.34.030(5)(c). Even the State concedes in its brief that the Schermers' financial resources are not relevant to the issue of whether H.S. is a dependent child.[9] The statutes provide for child support from parents after their children have been determined to be dependent.[10] Thus, the Schermers' financial resources would be considered in determining their obligations to support H.S. during his dependency. To say the Schermers are required to sell their house before their child may be declared dependent is inconsistent with public policy as embodied in the Homestead laws[11] and in the Washington Administrative *358 Code (WAC), which in an analogous situation explicitly exempts the residences of involuntarily committed mental health patients from the assets available to the State as payment for the costs of their hospitalization.[12]
¶ 22 While it is true that at the time of the hearing H.S. was still residing in a private treatment facility where his needs were being met, the Schermers testified that H.S. was in danger of being released from the facility within a couple of weeks due to the Schermers' failure to pay his bills for the past two months. Thus, reading the evidence in the light most favorable to H.S., within two weeks of the hearing he was to be released from the residential care facility to be delivered into the care of parents who were unable to adequately meet his acute psychological needs.
¶ 23 Counsel for H.S. stated during the hearing that H.S.'s situation was "a train headed towards the end of the track" and cautioned against waiting until there was a crisis before a dependency could be established. We have previously held that "RCW 13.34.030(5) does not require evidence of actual harm, only `clear and present danger to the child's health, welfare and safety[.]'"[13] Reading the evidence in the light most favorable to H.S., H.S. was in circumstances which constituted a clear and present danger of substantial damage to his psychological or physical development due to his imminent release from an institution that could adequately meet his acute psychological needs, and his delivery into the care of his parents, who were unable to adequately meet his acute psychological needs.[14]
¶ 24 For the above reasons, we reverse and remand for a full hearing.
WE CONCUR: SCHINDLER, A.C.J., and ELLINGTON, J.
NOTES
[1] Mr. Schermer testified that the family owned 50 shares of Microsoft stock, worth a total of $3,000-$4,000.
[2] During the hearing H.S.'s attorney moved to have H.S. made a party to the petition. The trial court granted the motion without objection from the State.
[3] RCW 13.34.030(5)(c).
[4] See N. Fiorito Co. v. State, 69 Wash.2d 616, 619-620, 419 P.2d 586 (1966).
[5] In the Matter of the Dependency of C.M., 118 Wash.App. 643, 78 P.3d 191 (2003).
[6] In the case at bar, the trial court relied on Dependency of T.J.B., 115 Wash.App. 182, 62 P.3d 891 (2002) for the same proposition as the basis of its ruling. For the same reasons set forth in Dependency of C.M. and explained below, this proposition does not conflict with our ruling here.
[7] Dependency of C.M., 118 Wash.App. at 654, 78 P.3d 191 (citations omitted).
[8] As the trial court stated, "No, the . . . issue is whether [H.S.] has a parent who can, who can cause him to be cared for."
[9] As the State says in its brief, "The Schermers' Financial Resources are Not Relevant to the Issue of Whether H.S. was a Dependent Child."
[10] See RCW 13.34.160(1) ("In an action brought under this chapter, the court may inquire into the ability of the parent or parents of the child to pay child support and may enter an order of child support as set forth in chapter 26.19 RCW.").
[11] See chapter 6.13 RCW.
[12] See WAC XXX-XXX-XXXX(2):

Real property shall also be an available asset to the estate: Provided, That the patient's home shall not be considered an available asset if that property is owned by the estate and serves as the principal dwelling and actual residence of the patient, the patient's spouse, and/or minor children and disabled sons or daughters: Provided further, That if the home is not being used for residential purposes by the patient, the patient's spouse, and/or minor children and disabled sons or daughters, and in the opinion of two physicians, there is no reasonable expectancy that the patient will be able to return to the home during the remainder of his life, the home shall be considered an asset available to the estate.
[13] In re Interest of J.F., 109 Wash.App. 718, 731, 37 P.3d 1227 (2001) (quoting In re Welfare of Frederiksen, 25 Wash.App. 726, 733, 610 P.2d 371 (1979)).
[14] Our decision in this case does not implicate the issues addressed in our recent decision in State v. G.A.H., 133 Wash.App. 567, 137 P.3d 66 (2006), and is not inconsistent with that decision. In G.A.H., we held that the juvenile court did not have the authority to determine a child was dependent in a juvenile offender proceeding to which DSHS was not a party, or to order DSHS to place the adjudicated offender in foster care at such a proceeding.