IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION ONE

| | | |
|---|---|---|
| CHRISTELLE CUNNINGHAM, | ) | No. 76612-1-I |
| | ) | |
| Appellant, | ) | |
| | ) | |
| v. | ) | UNPUBLISHED OPINION |
| | ) | |
| WASHINGTON STATE DEPARTMENT | ) | |
| OF SOCIAL AND HEALTH SERVICES, | ) | |
| | ) | |
| Respondent. | ) | FILED: December 17, 2018 |

SCHINDLER, J. — Licensed childcare provider Christelle Cunningham left a four-year-old child alone at a community center park. The Department of Social and Health Services (DSHS) found Cunningham engaged in negligent treatment under RCW 26.44.020(17) and former WAC 388-15-009(5). The DSHS Board of Appeals Review Judge upheld the finding of negligent treatment that evidenced a serious disregard of consequences of such magnitude as to constitute a clear and present danger to the child. The superior court affirmed the decision of the DSHS Board of Appeals Review Judge and the Final Order. Cunningham contends the DSHS Board of Appeals Review Judge erroneously interpreted and applied the law, substantial evidence does not support the finding of negligent treatment, and the Final Order is arbitrary and

capricious. Cunningham also contends the superior court erred in denying her motion to amend the petition for judicial review. We affirm.

Child Protective Services Referral

Christelle Cunningham has been a licensed childcare provider since 2008 and owned and operated Kids R Us day care. In July 2014, Cunningham hired Tiffany Jones as a childcare assistant.

On August 1, 2014, Cunningham and Jones drove 10 children, including four-year-old T.J., in a van to the Garfield Community Center playground. They left Garfield Community Center before noon to drive to the Tukwila Community Center.

Two middle school girls found four-year-old T.J. alone at the playground. Garfield Community Center staff contacted the police. Seattle Police Officer Vincent Feuerstein responded and contacted Child Protective Services (CPS). The Division of Licensed Resources/Child Protective Services investigated the report of neglect of the child.

On August 4, CPS investigator Terri Muller interviewed Cunningham and Jones. Cunningham told Muller that at approximately 11:40 a.m., she and Jones "started loading" the children into the van to leave the Garfield Community Center. Cunningham went to the restroom before leaving. Cunningham said she "did not do a regular head count of the children" because she "thought [Jones] had" done the head count. However, Cunningham said she "routinely did seat belt checks." Cunningham said she and Jones "realized that TJ was missing" about "10 to 15 minutes" later and "immediately called the Garfield Community Center."

Jones told Muller she did not "count the children prior to leaving the playground." Jones said it was " '20 minutes' " before "anyone realized that TJ was missing."

Muller interviewed Garfield Community Center employees Champaine O'Brien and supervisor Dwayne Jackson. O'Brien told Muller that two 12- or 13-year-old girls " 'found [T.J.] outside by himself' " and brought him into the gym at approximately 12:30 p.m. Jackson "attempted to talk to the boy" but T.J. "provided little additional information except to say that he was four." Jackson said Cunningham called about T.J. "approximately 45 minutes after the police arrived at the community center."

Muller issued a report finding negligent treatment of four-year-old T.J. The report states Cunningham disregarded the consequences to the child of such magnitude as to constitute "a clear and present danger to the child's health, welfare, and safety":

> After investigation it is determined, more likely than not, that the allegation of Negligent Treatment or Maltreatment of four year old T.[J]. by Christelle Cunningham is FOUNDED. There was an act, or failure to act on the part of Ms. Cunningham that shows a serious disregard of the consequences to the child of such magnitude that it created a clear and present danger to the child's health, welfare, and safety.

DSHS notified Cunningham by letter on November 12, 2014 of the finding. On November 14, the Department of Early Learning (DEL) notified Cunningham she was disqualified to provide childcare and her license was revoked.

Administrative Appeal

Cunningham appealed the DSHS finding of negligent treatment and the DEL decision to revoke her childcare license. The Office of Administrative Hearings consolidated the two appeals for hearing. A number of witnesses testified, including Cunningham, Jones, Seattle Parks and Recreation Department employees Debra Khaljani and Jackson, Officer Feuerstein, and CPS investigator Muller.

3

Cunningham testified, "[W]e always do a headcount." Cunningham said that before going to the restroom, she told Jones to " '[f]inish loading up the kids' " in the van and " 'finish off the headcount and count the seatbelts.' " Cunningham said that when she returned to the van, it was "already locked up." Cunningham testified she asked Jones if she did " 'all the seatbelt checks' " and Jones said, " 'Yes.' "

When Cunningham "realized" she "didn't have" T.J., she "panicked" because "I didn't know where my kid was. Maybe somebody came and snatched him." Cunningham admitted it was "a very serious situation" and T.J. "was at risk of harm."

Jones testified that she did not "recall" Cunningham "ask . . . about any headcounts." Jones said, "[W]e got in the van, and we were like, 'Is everyone here?' And they're like, 'Yeah.' And we pulled off."

Investigator Muller testified it is "a dangerous situation" for a "very young child to be alone in . . . any situation unsupervised. . . . [A] four-year-old child requires stringent supervision. . . . [T]hey're young, they're vulnerable, they're unable to self-protect." Muller said T.J. was "even more vulnerable" because he was "unable to communicate . . . or identify his full name."

Muller testified about the circumstances that "posed an imminent risk of harm."

> [A] four-year-old child, being alone in a park setting like that with access to the street and the parking lot that's right there, . . . that poses a risk to me that there's easy access for someone to, uh, observe that child being alone, and . . . have contact with that child . . . . [T]he child could've . . . hurt himself or sustained some type of injury. He could've entered into the parking lot, where people are driving in and out . . . . There's so many things about it that had the potential for serious harm.

Muller also testified that 19 registered sex offenders lived within "a half a mile" of the community center.

4

The administrative law judge (ALJ) upheld the DSHS finding of negligent treatment and the DEL order revoking Cunningham's childcare license. The ALJ issued an "Initial Order" and extensive findings of fact and conclusions of law. Preliminarily, the ALJ notes the evidence conflicts "on certain material points" and the decision and findings reflect "a careful consideration of the record of the case, including the demeanor and motivations of the parties and witnesses, the reliability and/or other reasonableness of the testimony and/or exhibits, and the totality of the evidence presented." The ALJ states, "Findings made in compliance with a particular witness's or witnesses' testimony and/or other evidence presented indicate the undersigned found that evidence to be credible over conflicting evidence, considering the burden of proof and standard of proof." The ALJ also notes, "When possible and reasonable, the undersigned has harmonized the different recountings of certain events and occurrences in order to arrive at a determination of the facts surrounding those events and occurrences."

The ALJ found that Cunningham and Jones left T.J. at Garfield Community Center "between 11:40 and 11:50 a.m." The ALJ did not find Cunningham's testimony that a headcount was performed credible. The ALJ found Cunningham and Jones did not do a headcount of the children despite "assertions to the contrary." The ALJ found the "two young girls" saw T.J. "playing alone on a slide for about a half hour" and brought him into the Garfield Community Center gym at approximately 12:20 p.m. The ALJ found Cunningham did not call Garfield Community Center until "90 minutes after the child care group left to go to Tukwila."

The ALJ cites chapter 26.44 RCW, "Abuse of Children," and highlighted the following pertinent part of WAC 388-15-009(5):[1]

> Negligent treatment or maltreatment means an act or a failure to act, or the cumulative effects of a pattern of conduct, behavior, or inaction, on the part of a child's parent, legal custodian, guardian, or caregiver that shows a serious disregard of the consequences to the child of such magnitude that it creates a clear and present danger to the child's health, welfare, or safety. A child does not have to suffer actual damage or physical or emotional harm to be in circumstances which create a clear and present danger to the child's health, welfare, or safety. Negligent treatment or maltreatment includes, but is not limited, to:
>
> . . . .
>
> (b) Actions, failures to act, or omissions that result in injury to or which create a substantial risk of injury to the physical, emotional, and/or cognitive development of a child.

The ALJ concluded the preponderance of the evidence supports finding negligent treatment that constitutes a clear and present danger to a child's welfare and safety.

Conclusion of law 9 states:

> The undersigned finds and concludes that a preponderance of the evidence supports a determination that Appellant Christelle Cunningham committed acts of neglect as to the child TJ. She neglected him when she failed to provide proper supervision which resulted in his being left alone at Garfield Playfield, creating a clear and present danger to TJ's safety and welfare because her actions or failure to act created a substantial risk of injury to TJ. The fact that TJ apparently suffered no harm is irrelevant. The substantial risk of harm (e.g. being injured by traffic, or on the Playfield, or abducted) was clear, present, and significant.

The Initial Order states Cunningham "did negligently treat the child TJ."

---

[1] Effective July 1, 2018, the Department of Children, Youth and Families replaced DSHS and DEL as the state agency responsible for children and early learning issues. See SECOND ENGROSSED SECOND SUBSTITUTE H.B. 1661, 65th Leg., 3rd Spec. Sess. (Wash. 2017). Title 388 WAC and Title 170 WAC were recodified as Title 110 WAC. Wash. State Register (WSR) 18-14-078. For purposes of this opinion, we cite the WAC in effect before the 2018 recodification.

The ALJ also concluded Cunningham is disqualified from providing childcare and upheld the decision of DEL to revoke her childcare license:

> Based upon the founded finding of neglect made against the Appellant, she must be disqualified from providing child care or having unsupervised access to children. . . . Further, the Appellant has numerous additional child care licensing violations which warrant revocation of her child care license.[2]

Cunningham appealed the ALJ finding of negligent treatment to the DSHS Board of Appeals and the decision to revoke her childcare license to a DEL Review Judge. The DEL Review Judge stayed review of the proceeding "pending issuance of a final agency decision by the DSHS Board of Appeals."

In the appeal to the DSHS Board of Appeals, Cunningham does not assign error to any of the findings of fact of the Initial Order on negligent treatment. Cunningham assigned error to only the conclusion of law on negligent treatment, conclusion of law 9. Cunningham argued the ALJ found she "did not mean to leave TJ at the park" and therefore, DSHS did not prove "a serious disregard of the consequences to the child" under WAC 388-15-009(5).

The DSHS Board of Appeals Review Judge considers a finding of negligent treatment on the record de novo. WAC 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(3). The DSHS Board of Appeals Review Judge issued a "Review Decision and Final Order" (Final Order) affirming the Initial Order and finding of negligent treatment. The Final Order adopts the following

---

[2] The ALJ also found that Cunningham violated "numerous additional child care licensing" requirements between 2008 and 2014, including WAC 170-296-0520(1) (documentation of attendance), WAC 170-296A-5625(1) (capacity and supervision requirements), WAC 170-296A-5750 (staff-to-child ratios), WAC 170-296A-2200(1) (911 reporting requirements), WAC 170-296A-2250(1) (reporting to parent or guardian requirements), WAC 170-296A-2300 (reporting to DSHS requirements), WAC 170-296A-6475(6) (transportation requirements), WAC 170-296A-1875 (primary staff requirements), WAC 170-296A-1200(3) and (4) (leaving children with an unlicensed individual), and WAC 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 (background clearance requirements).

unchallenged findings of fact:

**Incident of August 1, 2014**

11. On August 1, 2014, the Appellant decided to take her child care children on a field trip off-site from her child care home. One of the children entrusted to her care on this day (of the 10 total children on the trip) was TJ, who was then 4 years old. Also on the field trip was Tiffany Jones, the Appellant's new assistant who had been working at the child care for less than a month, and who had not been approved to have unsupervised contact with the children in care because her background authorization had not yet cleared. August 1, 2014, was described by the Appellant as a busy day in Seattle due to Seafair celebrations around the city.

12. The first stop the Appellant and Ms. Jones made with the children was at the playground around the Garfield Community Center. The playground is on property with a Community Center, and next to a high school. After being at this playground for a short period of time, the Appellant decided that Ms. Jones and she should take the children to another venue in Tukwila.

13. The Appellant testified that she went to the restroom by the Garfield playground while the van was being loaded with child care children. Ms. Jones testified that the Appellant went to the restroom immediately after the van was loaded, before leaving for Tukwila. The undersigned does not find that a head count of the child care children was performed despite the Appellant's and Ms. Jones' assertions to the contrary. The reasons that the undersigned does not believe that a head count was performed are as follows: (a) had a head count been performed, the absence of TJ (who was left at Garfield as is more fully discussed below) should have been known; (b) the Appellant and Ms. Jones gave contradictory testimony regarding whether the Appellant had asked Ms. Jones if a head count had been performed; (c) at hearing Ms. Jones asserted that a head count technique had been used which involved 10 separate attendance sheets for the 10 children on the field trip; (d) at hearing the Appellant denied that any written form of head count was utilized; (e) the Appellant told CPS Investigator Terri Muller on August 4, 2014, that no head count had been performed when leaving Garfield; (f) Ms. Jones told Ms. Muller that . . . no head count had been performed before the child care group left Garfield.

14. The Appellant, Ms. Jones, and 9 of the 10 child care children on the field trip left Garfield to go to Tukwila between approximately 11:40 and 11:50 a.m. TJ was left behind at the Garfield playground.

15. At approximately 12:20 p.m., TJ was brought into the Garfield Community Center after being observed outside and alone for approximately 30 minutes. He could not provide any contact information; he could not identify himself other than to say he was TJ. The area in which the Garfield Community Center is located is not a safe area for

young children to be left alone in because it abuts a busy street and because, at the time, 19 registered sex offenders resided within a one-half mile radius of the playground. Furthermore, the playground is not a safe place for unsupervised young children because of the risk of falling or otherwise getting hurt on slides and other play structures. Seattle Police were called not by the Appellant but by Ms. Khaljani, who was working at the Community Center. The police were dispatched to the Community Center at 12:41 p.m., arriving at 12:51 p.m. Officer Hartsock met TJ, who told him: "I am TJ and I am 4 years old." TJ stated that he was with "Miss Christelle." TJ was unaware of his address, parents' names, or how he ended up at the Garfield Community Center.

16. At some point after arriving at Tukwila, the fact that TJ was not in the child care van was discovered. The drive to Tukwila from Garfield would have taken at least 20 minutes and quite possibly longer, considering the route taken and given the evidence that it was a busy day in Seattle.

17. Upon discovering TJ missing, the Appellant did the following: (a) she left Ms. Jones with the 9 child care children that had been transported to Tukwila; (b) she called 4-1-1 at 1:04 p.m. asking for the telephone number for the Garfield Community Center; (c) she called the Community Center and spoke with Officer Hartstock and advised him that she believed Ms. Jones had custody of TJ and did not realize that he was missing until a head count was performed once she, Ms. Jones, and the children arrived in Tukwila and that she called the Community Center as soon as she realized TJ was missing, which was nearly 90 minutes after the child care group had left to go to Tukwila; (d) she arrived at the Community Center at some point after 1:04 p.m. and was unable to provide the police with requisite parent and child documentation or evidence of her caretaker role for TJ; and (e) she left the Community Center to go back to the child care facility in West Seattle to retrieve the necessary documents while TJ was left in the care of the police.

. . . .

20. The Appellant told the Seattle Police on August 1, 2014, that when she and Ms. Jones had "approximately 8 children" and decided to take the children to the pool in Tukwila previously that morning, she had assumed Ms. Jones had custody of TJ, and did not realize he was missing until she conducted a head count at the pool, at which point she called the Garfield Community Center, nearly 90 minutes after she had left the Garfield Community Center.

. . . .

22. Because the August 1, 2014, incident was indicative of possible child abuse or neglect, CPS was the agency charged with investigating the allegations. After Seattle Police called in a CPS referral, the matter was immediately assigned to Terri Muller to investigate. DEL was also notified of the referral.

23. As part of her investigation, Ms. Muller reviewed the Seattle Police Department records regarding the incident of TJ being left at the Garfield playground. She spoke to numerous persons.

. . . .

28. On August 6, 2014, Ms. Muller spoke with Champaine O'Brien, who was working at Garfield Community Center through a youth employment program. She told Ms. Muller that on August 1, 2014, she was handing out lunches to children in the gym of the Community Center building and two young girls, ages 12 or 13, came into the gym with a young boy (later determined to be TJ) and said they found him outside by himself. The police were notified.

29. Ms. Muller spoke to Dwayne Jackson on August 6, 2014. He was also employed at the Garfield Community Center on August 1, 2014. He told her that he arrived at work at approximately 12:30 p.m. and TJ was there. He went to the gym to help with TJ. He said that the girls who found TJ told him that they saw TJ playing alone on a slide for about half an hour, and they walked around the playground to see if they could find anyone that TJ belonged to, and then finally brought him into the Community Center because they had to leave. Mr. Jackson told Ms. Muller that it was approximately 45 minutes after the police arrived that the Appellant called looking for TJ, and that it then took her about an hour to get back to the Community Center. Mr. Jackson gave consistent testimony at the hearing.[3]

The DSH Board of Appeals Review Judge entered the following additional

"Ultimate Fact Findings":

33. Despite the Appellant's and Ms. Jones' assertions to the contrary, a head count of the day care children was not performed when the Appellant left the Garfield playground to go to Tukwila. The reasons for this finding are: (a) if a head count had been performed, the absence of TJ should have been known; (b) the Appellant and Ms. Jones gave conflicting testimony regarding whether the Appellant had asked Ms. Jones if a head count had been done; (c) at hearing, Ms. Jones asserted that a head count technique had been used that involved 10 separate attendance sheets for the ten children on the field trip; (d) at hearing the Appellant denied that any written form of head count was used; (e) the Appellant told Ms. Muller on August 4, 2014, that no head count had been performed when leaving Garfield; (f) Ms. Jones told Ms. Muller during the course of Ms. Muller's investigation of the alleged neglect of TJ that no head count had been performed before the child care group left Garfield.

34. The Appellant did not mean to leave TJ at the park.

---

[3] Footnotes omitted.

35.   TJ was a four-year-old child left alone on a busy playground. The Appellant was responsible for supervising him, and did not do so for a period of at least two hours. Risks to TJ included falling off the slide he was playing on and getting injured; getting injured by rough play with older children; being bit by a dog; walking away from the playground into a busy parking lot or onto a busy street and being hit by a car; being kidnapped or abused by a stranger; children like to jump on things, they can jump off a toy and injure themselves; in an emergency, like an earthquake or fire, a child left alone would have no one to assist him. He walked off the playground without objection with the two girls who found him alone. He could have walked off the playground without objection with dangerous persons.

36.   The Appellant exposed TJ to a significant risk of harm because he was left at a busy playground without adequate adult supervision for at least an hour, and without her supervision for at least two hours. The Appellant should have known that he was missing from the day care group. Her failure to count heads, or use some other simple means to determine whether she had all of the child care children with her, evidences a serious disregard of consequences of such magnitude as to constitute a clear and present danger to TJ's health, welfare, or safety. If she had, in fact, checked the seat belts, as she claimed to have done, she would have realized that TJ was not in his seat in the van.

The Final Order cites chapter 26.44 RCW and WAC 388-15-009(5).

8.   Chapter 26.44 of the Revised Code of Washington (RCW) is entitled "Abuse of Children." It establishes a system for reporting instances of non-accidental injury, neglect, death, abuse, and cruelty to children. The Legislature's intent in adopting RCW 26.44 is that, as a result of these reports, protective services will be made available in an effort to avoid further abuse and to safeguard the general welfare of these children. The Department investigates reports of child abuse and neglect and notifies the alleged perpetrator of its investigative findings. A person so named by the Department as an alleged perpetrator has the right to request an adjudicative hearing governed by the Administrative Procedure Act, chapter 34.05, RCW. The Department has implemented chapter 26.44 RCW by adopting chapter 388-15 of the Washington Administrative Code (WAC) entitled "Child Protective Services."

9.   The Department's determination that the Appellant had abused or neglected a child was based on WAC 388-15-009, which provides, in pertinent part:

> **WAC 388-15-009 What is child abuse or neglect?** Child abuse or neglect means the injury, sexual abuse, sexual exploitation, negligent treatment, or maltreatment of a child under circumstances which indicate that the child's health, welfare, and

safety is harmed. An abused child is a child who has been subjected to child abuse or neglect as defined in this section.

. . . .

(5) Negligent treatment or maltreatment means an act or a failure to act on the part of a child's parent, legal custodian, guardian, or caregiver that shows a serious disregard of the consequences to the child of such magnitude that it creates a clear and present danger to the child's health, welfare, and safety. A child does not have to suffer actual damage or physical or emotional harm to be in circumstances which create a clear and present danger to the child's health, welfare, and safety. Negligent treatment or maltreatment includes, but is not limited, to:

(a) Failure to provide adequate food, shelter, clothing, supervision, or health care necessary for a child's health, welfare, and safety. Poverty and/or homelessness do not constitute negligent treatment or maltreatment in and of themselves;

(b) Actions, failures to act, or omissions that result in injury to or which create a substantial risk of injury to the physical, emotional, and/or cognitive development of a child; or

(c) The cumulative effects of consistent inaction or behavior by a parent or guardian in providing for the physical, emotional and developmental needs of a child's, or the effects of chronic failure on the part of a parent or guardian to perform basic parental functions, obligations, and duties, when the result is to cause injury or create a substantial risk of injury to the physical, emotional, and/or cognitive development of a child.

The Department alleged that the Appellant negligently treated or maltreated TJ, a child in her care, by leaving this young child alone on a playground. The Department alleged that definition of negligent treatment of a child includes failures to act, where that failure shows serious disregard of a clear and present danger to that child. The Appellant should have known that TJ was missing from the day care group. The Appellant did not provide adequate supervision for TJ. Her failure to supervise shows a serious disregard of the possible consequences to the child of such magnitude that it created a clear and present danger to TJ's health, welfare, and safety. [4]

---

[4] Footnotes omitted.

The DSHS Board of Appeals Review Judge concluded Cunningham "exposed TJ to a significant risk of harm."

10. TJ was a four-year-old child left alone on a busy playground. The Appellant was responsible for supervising him, and did not do so for a period of at least two hours. A young child like TJ does not have a real awareness of danger and might wander away. This behavior can lead to being hit by a car due to his short stature, either in the parking lot or in the street. Other catastrophes that were possible in this case include, molestation, abduction, and injury, with the possible outcome of death for this preschool child. Additional risks to TJ included falling off the slide he was playing on and getting injured; getting injured by rough play with older children; being bit by a dog; jumping off a toy and injuring himself, and, in an emergency, like an earthquake or fire, a child left alone would have no one to assist him. He walked off the playground without objection with the two girls who found him alone. He could have walked off the playground without objection with dangerous persons.

11. The Appellant exposed TJ to a significant risk of harm because he was left at a busy playground without adequate adult supervision, and the Appellant should have known that he was missing from the day care group. The fact that TJ was found safe, and was secured by friendly children and adults, does not detract from the magnitude of the Appellant's neglect of her duty to keep track of the children in her care and custody. Her failure to count heads, or use some other simple means to determine whether she had all of the child care children with her, evidences a serious disregard of consequences of such magnitude as to constitute a clear and present danger to TJ's health, welfare, or safety. A child does not need to suffer actual harm for a finding of negligent treatment; exposure to clear and present danger risk is enough. If the Appellant had made a head count, or had, in fact, checked the seat belts, as she claimed to have done, she would have realized that TJ was not in his seat in the van. A preponderance of the evidence supports a conclusion that the Appellant neglected TJ, a child in her care.

The Final Order affirms the finding of negligent treatment or maltreatment.

Superior Court Appeal

On January 20, 2016, Cunningham filed a petition for judicial review of the DSHS Board of Appeals Final Order affirming negligent treatment. Cunningham argued (1) substantial evidence did not support a finding of negligent treatment, (2) her conduct did

not "constitute child neglect or negligent treatment," and (3) the agency finding was arbitrary and capricious.

After Cunningham filed the petition, the DEL Review Judge issued a "Final Order" affirming the DEL order finding Cunningham disqualified from providing childcare and revoking her childcare license.[5] Cunningham filed a CR 15 motion to amend the petition to add judicial review in superior court of the DEL order. The court denied the CR 15 motion to amend the petition. The superior court affirmed the DSHS Final Order. Cunningham appeals.

Standard of Review

The Washington Administrative Procedure Act (APA), chapter 34.05 RCW, governs review of agency decisions. Postema v. Pollution Control Hr'gs Bd., 142 Wn.2d 68, 76-77, 11 P.3d 726 (2000). Under RCW 34.05.570(3), we will grant relief from an agency order in an adjudicative proceeding if the order exceeds the statutory authority of the agency, the agency erroneously interpreted or applied the law, substantial evidence does not support the order, or the order is arbitrary or capricious.

We review only the Final Order of the DSHS Board of Appeals Review Judge, not the decision of the ALJ or the superior court. Verizon Nw., Inc. v. Emp't Sec. Dep't, 164 Wn.2d 909, 915, 194 P.3d 255 (2008). The appellant has the burden of demonstrating the invalidity of agency action. Darkenwald v. Emp't Sec. Dep't, 183 Wn.2d 237, 244, 350 P.3d 647 (2015).

We review findings of fact for substantial evidence. Mowat Constr. Co. v. Dep't of Labor & Indus., 148 Wn. App. 920, 925, 201 P.3d 407 (2009). Substantial evidence

---

[5] WAC 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(1) and (3)(a) provides that a person shall be disqualified to "provid[e] licensed childcare" if her background information "contains a negative action . . . that relates to . . . [a]n act, finding, determination, decision, or the commission of abuse or neglect of a child."

is evidence sufficient to persuade a fair-minded person of the truth of the matter. Mowat, 148 Wn. App. at 925. We do not weigh witness credibility or substitute our judgment for the agency's findings of fact. Port of Seattle v. Pollution Control Hr'gs Bd., 151 Wn.2d 568, 588, 90 P.3d 659 (2004). Where, as here, the appellant does not assign error to any of the findings, the unchallenged findings are verities on appeal. Darkenwald, 183 Wn.2d at 244.

We review questions of law and the agency's application of the law to the facts de novo. Cornelius v. Dep't of Ecology, 182 Wn.2d 574, 585, 344 P.3d 199 (2015). But we afford "great weight" to the agency's interpretation of law "where the statute is within the agency's special expertise." Cornelius, 182 Wn.2d at 585.

Statutory Authority

RCW 26.44.020(1) defines "neglect" as "the negligent treatment or maltreatment of a child by a person responsible for or providing care to the child." RCW 26.44.020(17)[6] defines "negligent treatment," in pertinent part, as follows:

> "Negligent treatment or maltreatment" means an act or a failure to act, or the cumulative effects of a pattern of conduct, behavior, or inaction, that evidences a serious disregard of consequences of such magnitude as to constitute a clear and present danger to a child's health, welfare, or safety.

WAC 388-15-009(5) defines "negligent treatment" of a child, in pertinent part, as follows:

> Negligent treatment or maltreatment means an act or a failure to act, or the cumulative effects of a pattern of conduct, behavior, or inaction, on the part of a child's parent, legal custodian, guardian, or caregiver that shows a serious disregard of the consequences to the child of such magnitude that it creates a clear and present danger to the child's health, welfare, or

---

[6] The legislature renumbered RCW 26.44.020(16) to subsection (17) in 2018. See Reviser's note (1) ("The definitions in this section have been alphabetized pursuant to RCW 1.08.015(2)(k)."). Because the definition of "negligent treatment" has not changed, we cite the current statute RCW 26.44.020(17) throughout the opinion.

safety. A child does not have to suffer actual damage or physical or emotional harm to be in circumstances which create a clear and present danger to the child's health, welfare, or safety. Negligent treatment or maltreatment includes, but is not limited, to:

(a) Failure to provide adequate food, shelter, clothing, supervision, or health care necessary for a child's health, welfare or safety. Poverty and/or homelessness do not constitute negligent treatment or maltreatment in and of themselves;

(b) Actions, failures to act, or omissions that result in injury to or which create a substantial risk of injury to the physical, emotional, and/or cognitive development of a child; or

(c) The cumulative effects of a pattern or conduct, behavior or inaction by a parent or guardian in providing for the physical, emotional and developmental needs of a child's, or the effects of chronic failure on the part of a parent or guardian to perform basic parental functions, obligations, and duties, when the result is to cause injury or create a substantial risk of injury to the physical, emotional, and/or cognitive development of a child.

Cunningham contends the DSHS Board of Appeals exceeded its statutory authority by relying on the failure to supervise under the WAC 388-15-009(5)(a) definition of "negligent treatment" without regard to whether DSHS proved serious disregard of the consequences that created a clear and present danger.

In Marcum v. Department of Social & Health Services, 172 Wn. App. 546, 558-59, 290 P.3d 1045 (2012), the court held the board exceeded its statutory authority by treating the failure to provide adequate supervision under WAC 388-15-009(5)(a) as per se negligent treatment without regard to whether the record established "a serious disregard of consequences of such magnitude" that created "a clear and present danger to a child's health, welfare, or safety" as required under RCW 26.44.020(17). The court held DSHS "lacks the authority to promulgate and interpret a rule that fundamentally shifts the standard required to make a neglect finding" under RCW 26.44.020(17). Marcum, 172 Wn. App. at 559. The court vacated the finding of negligent treatment

under WAC 388-15-009(5). Marcum, 172 Wn. App. at 559. However, the court in Marcum notes:

> Had the Board concluded that [appellant]'s actions "evidence[d] a serious disregard of consequences of such magnitude as to constitute a clear and present danger to a child's health, welfare, or safety," . . . we would give substantial weight to such an interpretation in light of DSHS's expertise in this field.

Marcum, 172 Wn. App. at 560[7] (quoting RCW 26.44.020(17)).

Unlike in Marcum, here, the DSHS Board of Appeals Review Judge did not disregard the statutory definition of negligent treatment. The extensive unchallenged findings support the conclusion that leaving four-year-old T.J. alone at the Garfield Community Center playground for approximately an hour and a half evidences a serious disregard of consequences of such magnitude as to constitute a clear and present danger to T.J.'s welfare or safety.

For the first time on appeal, Cunningham claims DSHS exceeded its statutory authority in promulgating WAC 388-15-009(5) "to the extent it allows the Department to circumvent the requirements" of RCW 26.44.020. " '[A] party attacking the validity of an administrative rule has the burden of showing compelling reasons that the rule is in conflict with the intent and purpose of the legislation.' " State ex rel. Evergreen Freedom Foundation v. Educ. Ass'n., 140 Wn.2d 615, 635, 999 P.2d 602 (2000)[8] (quoting Green River Cmty. Coll. v. Higher Ed. Pers. Bd., 95 Wn.2d 108, 112, 622 P.2d 826 (1980)). Cunningham cannot meet her burden. WAC 388-15-009(5) mirrors the statutory definition under RCW 26.44.020(17) and DSHS did not exceed its authority by

---

[7] Second alteration in original.

[8] Alteration in original.

listing examples of negligent treatment. See RCW 74.08.090 (general rule making authority); chapter 26.44 RCW (Children Abuse and Neglect Act).[9]

RCW 26.44.020

Cunningham contends the DSHS Board of Appeals Review Judge erroneously interpreted and applied the law by ignoring the "clear intent and plain meaning" of RCW 26.44.020(17).

We review the meaning of a statute de novo. Dep't of Ecology v. Campbell & Gwinn, LLC, 146 Wn.2d 1, 9, 43 P.3d 4 (2002). Our objective is to discern and implement the legislature's intent. Lowy v. PeaceHealth, 174 Wn.2d 769, 779, 280 P.3d 1078 (2012). If the statute's meaning is plain on its face, we give effect to that plain meaning as an expression of legislative intent. Campbell & Gwinn, 146 Wn.2d at 9-10. We give effect to all language used in a statute, rendering no part superfluous. HomeStreet, Inc. v. Dep't of Revenue, 166 Wn.2d 444, 452, 210 P.3d 297 (2009). The rules of statutory interpretation apply to administrative rules and regulations. Whatcom County v. W. Wash. Growth Mgmt. Hr'gs Bd., 186 Wn.2d 648, 667-68, 381 P.3d 1 (2016).

RCW 26.44.020(17) defines "negligent treatment or maltreatment" as "an act or a failure to act . . . that evidences a serious disregard of consequences of such magnitude as to constitute a clear and present danger to a child's health, welfare, or safety."

Cunningham also argues insufficient evidence supports finding negligent treatment because the evidence showed she did not "intentionally" leave T.J. at Garfield

---

[9] We note DSHS amended WAC 388-15-009(5) in 2017 to state that negligent treatment "may include, but is not limited to," the "[f]ailure to provide adequate food, shelter, clothing, supervision, or health care necessary" to the child's welfare or safety. WSR 17-22-059 (emphasis in original) (codified at former WAC 388-15-009(5)(e)(i) (2017)).

Community Center. Citing <u>Brown v. Department of Social & Health Services</u>, 190 Wn. App. 572, 360 P.3d 875 (2015), Cunningham asserts the statute requires proof of an intentional act. Neither <u>Brown</u> nor the plain language of the statute supports her argument.

In <u>Brown</u>, the court held DSHS erred by using a "reasonable person" standard in finding neglect under RCW 26.44.020(17) because the statutory definition requires a "higher standard" than simple negligence. <u>Brown</u>, 190 Wn. App. at 592-93. The court in <u>Brown</u> also notes "serious disregard" under RCW 26.44.020(17) is analogous to "reckless disregard," which is defined as an intentional act or failure to act. <u>Brown</u>, 190 Wn. App. at 590.

The plain and unambiguous language of RCW 26.44.020(17) does not require a showing of negligent treatment. Consistent with <u>Brown</u>, the plain and unambiguous language of the statute requires proof of a failure to act that evidences a serious disregard of consequences of such magnitude as to constitute a clear and present danger to the child's health, welfare, or safety. And unlike in <u>Brown</u>, the DSHS Board of Appeals Review Judge did not use a reasonable person standard.

Cunningham also claims "clear and present danger" means "actual" danger that is "unmistakable and free from ambiguity." Cunningham argues "exposure to potential risks" is insufficient to show "clear and present danger." We disagree. The plain language of the statute does not require actual harm to show a "clear and present danger" to a child's health, welfare, or safety. See <u>In re Dependency of H.S.</u>, 135 Wn. App. 223, 233, 144 P.3d 353 (2006). A "clear and present" danger must be close in time to the act or failure to act. See <u>In re Dependency of M.S.D.</u>, 144 Wn. App. 468,

19

481, 182 P.3d 978 (2008). The failure to protect a child from significant risk of harm is sufficient to show "clear and present danger." See, e.g., M.S.D., 144 Wn. App. at 480-481; In re Dependency of S.M.H., 128 Wn. App. 45, 60, 115 P.3d 990 (2005); In re Interest of J.F., 109 Wn. App. 718, 731, 37 P.3d 1227 (2001).

The unchallenged findings established that leaving four-year-old T.J. alone at the Garfield Community Center created a clear and present danger to T.J.'s health, safety, or welfare. The findings describe a number of risks to T.J., including the location of the playground near a busy street and parking lot and 19 registered sex offenders living within a half-mile radius of Garfield Community Center. Cunningham conceded it was a "very serious situation" and T.J. "was at risk of harm." Cunningham testified that she was scared "somebody came and snatched" T.J. and she "didn't know if he was kidnapped."

Arbitrary and Capricious

Cunningham contends the DSHS Board of Appeals Review Judge's interpretation of WAC 388-15-009(5) was arbitrary and capricious because the Final Order does not adequately address "whether there was a 'serious disregard' of the circumstances that created a 'clear and present' danger." The Final Order does not support her argument.

Agency action is " 'arbitrary and capricious if it is willful and unreasoning and taken without regard to the attending facts or circumstances.' " Rios v. Dep't of Labor & Indus., 145 Wn.2d 483, 501, 39 P.3d 961 (2002) (quoting Hillis v. Dep't of Ecology, 131 Wn.2d 373, 383, 932 P.2d 139 (1997)). Where there is room for two opinions, action

taken after due consideration is not arbitrary and capricious even though a reviewing court may believe it is erroneous. Rios, 145 Wn.2d at 501.

The DSHS Board of Appeals Review Judge considered the facts and circumstances in finding negligent treatment. The extensive unchallenged findings support the conclusion that the failure to supervise T.J. evidenced a serious disregard of consequences of such magnitude as to constitute clear and present danger to T.J. The Final Order is neither willful and unreasoning nor without consideration or regard of the facts and circumstances.

CR 15 Motion to Amend

Cunningham claims the court abused its discretion by denying the CR 15 motion to amend the petition for judicial review.

The ALJ held a consolidated hearing on the DSHS finding of negligent treatment and the DEL decision disqualifying Cunningham from caring for children and revoking her childcare license. Cunningham filed separate appeals to the DSHS Board of Appeals and the DEL Review Judge. The DEL Review Judge stayed the DEL appeal "pending issuance of a final agency decision" on negligent treatment by the DSHS Board of Appeals Review Judge.

On December 29, 2015, the DSHS Board of Appeals Review Judge entered a Final Order upholding the DSHS finding of negligent treatment. On January 20, 2016, Cunningham filed a petition in King County Superior Court for judicial review of the DSHS Final Order.

On January 22, the DEL Review Judge lifted the stay and issued a Final Order revoking Cunningham's childcare license. On February 10, DEL mailed the DEL Final

Order to her attorney. The Final Order includes a "Statement of Appeal Rights after Review Decision and Final Order" and states Cunningham must file a petition for judicial review within "(30) calendar days from the date of mail."

On April 26, Cunningham filed a CR 15(c) motion to amend the petition filed in superior court to add review of the DEL Final Order. Cunningham argued the DEL Final Order "relate[s] back to the original petition" and DEL would not be prejudiced. DSHS argued the Civil Rules "do not apply to the APA provisions governing judicial review of agency action" and the petition for judicial review of the DEL order was not timely under the APA, RCW 34.05.542(2). In reply, Cunningham did not address whether the petition for judicial review of the DEL Final Order was timely under the APA.

The court denied the motion to amend the petition for judicial review. The court ruled the "Administrative Procedure Act requires Petitioner to file her appeal within 30 days" and "[c]ase law makes clear that this court has no discretion to grant the Motion to Amend the Petition."

Cunningham contends the court abused its discretion by denying the CR 15(c) motion because the DEL Final Order relates back to the DSHS order. Because the APA establishes the "exclusive means of judicial review for agency action," we disagree. Diehl v. W. Wash. Growth Mgmt. Hr'gs Bd., 153 Wn.2d 207, 213, 103 P.3d 193 (2004); RCW 34.05.510. "The superior court and the parties are bound by the statutory mandate of the APA, and it is the statutory procedural requirements which must be met to invoke subject matter jurisdiction." Diehl, 153 Wn.2d at 217. When reviewing an administrative decision, "the superior court is acting in its limited appellate capacity, and all statutory procedural requirements must be met before the court's

22

appellate jurisdiction is properly invoked." Seattle v. Pub. Emp't Relations Comm'n, 116 Wn.2d 923, 926, 809 P.2d 1377 (1991).

RCW 34.05.542(2) provides that a petition for judicial review of an agency order "shall be filed with the court and served on the agency, the office of the attorney general, and all parties of record within [30] days after service of the final order." Cunningham filed the motion to amend the petition for judicial review to request review of the DEL order 76 days after DEL mailed the Final Order. Because Cunningham did not comply with the requirements of RCW 34.05.542, we conclude the court did not abuse its discretion by denying the motion to amend the petition for judicial review.

For the first time on appeal, Cunningham cites Devore v. Dep't of Soc. & Health Servs., 80 Wn. App. 177, 906 P.2d 1016 (1995), to argue her petition for judicial review of the DEL order was not untimely. Cunningham asserts the 30-day statute of limitations has not expired because DEL failed to properly serve the order on her under RCW 34.05.464(9). Devore is distinguishable.

In Devore, the trial court dismissed the petition for judicial review filed 33 days after DSHS mailed the final order "to the Devores addressed in care of [their attorney]." Devore, 80 Wn. App. at 180. Because " 'the APA requires a reviewing officer to serve copies of final orders "upon each party," ' " we reversed. Devore, 80 Wn. App. at 181-83 (quoting Union Bay Pres. Coal. v. Cosmos Dev. & Admin. Corp., 127 Wn.2d 614, 618-19, 902 P.2d 1247 (1995) (quoting RCW 34.05.464(9))). In Devore, the Devores "never authorized that service be made in care of their attorney, rather than to them directly." Devore, 80 Wn. App. at 182 n.3. The court held "requirement of service" is

not met "by merely addressing the mailing to the party in care of the party's attorney." Devore, 80 Wn. App. at 182.

Here, unlike in Devore, Cunningham expressly authorized service on her attorney. In her administrative appeal of the DEL order revoking her license, Cunningham "requests that all communication go through her attorney, Abigail Jin at Barokas Martin & Tomlinson 1422 Bellevue Avenue, Seattle, WA 98122, and phone number (206) 621-1871." In the "Witness and Exhibit List," Cunningham lists her address as in care of her attorney.

DSHS filed a motion to supplement the record with "Appendix X" under RAP 9.11(a). We grant the motion to supplement the record. Appendix X is a copy of the February 1, 2016 notice of appearance of Cunningham's attorney. The notice of appearance states, in pertinent part, "You are further notified that all further pleadings, notices, documents or other papers herein, exclusive of original process, may be had upon said Appellant by serving the undersigned attorney at the address below." Cunningham did not submit a response or oppose the motion.

Because Cunningham expressly authorized service on her attorney rather than to her directly, DEL properly mailed the DEL Final Order to the attorney, and her petition for review of the DEL order was untimely.[10]

---

[10] For the first time on appeal, Cunningham also cites RCW 34.05.510(2) to argue the Civil Rules apply because amending the petition for judicial review to include review of the DEL order is an "[a]ncillary procedural matter[ ]." RCW 34.05.510(2) states, in pertinent part, "Ancillary procedural matters before the reviewing court, including intervention, class actions, consolidation, [and] joinder . . . are governed, to the extent not inconsistent with this chapter, by court rule." Cunningham does not address whether the petition for review of the DEL Final Order is an ancillary procedural matter.

We affirm the DSHS Board of Appeals Final Order affirming the finding of negligent treatment and the superior court denial of the CR 15(c) motion to amend the petition for judicial review.[11]

WE CONCUR:

_Schindler, J._

_Chun, J._

_Dwyer, J._

---

[11] Because Cunningham is not the prevailing party, she is not entitled to fees under RAP 18.1 and Washington's equal access to justice act, RCW 4.84.340 through .360.